Esther MARCUS, Michele W., by her next friend Marie W., Larry Rhyne, Consuelo Allen, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Otis R. BOWEN, M.D., Secretary of Health and Human Services, Defendant.

No. 85 C 453.

United States District Court, N.D. Illinois, E.D.

Sept. 22, 1988.

Joseph A. Antolin, John M. Bouman, Hellen Cropper, Mary Elizabeth Kopko, Martha Tonn, Legal Assistance Foundation of Chicago, Chicago, Ill., for plaintiffs.

Anton R. Valukas, U.S. Atty., Mary S. Rigdon, Asst. U.S. Atty., Donna Morros Weinstein, Chief Counsel, Region V, U.S. Dept. of Health and Human Services, Thomas W. Crawley, Deputy Chief Counsel, Steven J. Plotkin, Jeffrey M. Teske, Donald T. McDougall, Michel T. Lamb, Asst. Regional Counsels, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiffs were denied disability benefits under the Social Security Act (the "Act"), 42 U.S.C. §§ 401 *et seq.*, Old Age, Survivors, and Disability Insurance ("OASDI"), and 1381 *et seq.*, Supplemental Security Income ("SSI"), following a determination by the Secretary of Health and Human Services ("Secretary") that they did not meet the Listed medical criteria for impairments (the "Listings"), 20 C.F.R. Part 404, Subpart P, Appendix 1, which the Secretary considers to be so severe as to preclude gainful activity. Plaintiffs challenge the Secretary's determinations on behalf of themselves and all similarly situated individuals, claiming that the refusal to evaluate the severity of their impairment in the context of their functional capacities violates the terms of the Act and deprives them of their constitutional right to due process. A class was certified in October 1985, *Marcus v. Heckler*, 620 F.Supp. 1218 (N.D.Ill.1985), and plaintiff class now moves for summary judgment.[1]

Plaintiffs' claim that they were unlawfully denied disability benefits raises two fundamental statutory questions: first, does the statute require the Secretary to determine individually the level of severity of each claimant's impairment or combination of impairments; and, second, if so, can such a requirement be reasonably met by comparing the clinical and laboratory evidence in a claimant's medical history to the medical criteria of specific Listings. The answer to the first question is unequivocally yes. The terms of the Act, as well as numerous court decisions, indicate that if the Secretary fulfills any adjudicatory role at all it is in determining the severity level of the impairments of individual claimants. Further, after a comprehensive review of the legislative and regulatory history, this court concludes that the denial of benefits to class members following comparison of medical indicia of impairment to specific Listings, without reference to the claimant's functional capacities, violates congressional intent.

The statutory and regulatory history of the Social Security disability program spans three decades of bureaucratic entanglement among Congress, administrative agencies, the federal courts and the millions of individuals who have sought entitlement. Amidst this administrative

---

1. Counsel for the plaintiffs, who are associated with the Legal Assistance Foundation of Chicago, and counsel for the Secretary have filed voluminous memoranda and appendices. Those have provided invaluable guidance through a complex statutory and administrative maze.

thicket is a constant tension between the need for uniform efficient management practices and just adjudication of individual entitlements. To accommodate this tension Congress has provided specific standards to be employed in an established administrative process and an elaborate system of administrative and judicial review.

■ This case is, primarily, about methodology for determining disability in three programs with somewhat different statutory mandates.[2] For a wage earner,[3] the Secretary must determine whether he or she (hereafter, for simplicity, "he") has impairments of such severity that, considering his age, education and work experience ("vocational factors"), he is unable to do either his previous work or any other substantial gainful work which exists in the national economy. For a child, the Secretary must determine whether his impairment is of comparable severity, but without consideration of vocational factors. For a widow, widower, or divorced spouse (hereinafter, for simplicity, "spouse"), the Secretary, without consideration of vocational factors, must determine whether he has impairments at a "level of severity which under regulations prescribed by the Secretary is deemed to be sufficient to preclude an individual from engaging in any gainful activity." (We hereafter refer to both "substantial gainful work" and "any gainful activity" as "gainful activity," since the distinction between them is irrelevant to the issues hereinafter discussed.)

Plaintiffs contend that the statutory scheme requires the Secretary to make an individualized determination of a claimant's ability to engage in gainful activity, and that requires an individualized assessment of functional impairment as it relates to that ability. The Secretary contends that he does so with respect to wage earners and that he has established a rational methodology which results in an approximation of the functional limitations of children and spouses, and that is all the statute requires him to do.

The contentions (which, as we shall see, are here presented in an overly simplified fashion) arise in the context of a massive social welfare program. The Secretary, quite properly, argues that Congress granted him broad authority to administer that program and that courts must necessarily defer to his judgment in constructing a methodology to determine disability. Plaintiffs agree with that concept; they insist, however, that the methodology adopted does not follow a statutory mandate to evaluate the individual claimant's ability to engage in gainful activity. We turn then to an overview of that methodology.

That methodology is a sequential screen or sieve. The first sieve screens out those who are still in the work force. The second screens out those who do not have a severe impairment. It is the third sieve which is critical here. The Secretary has established criteria in approximately 120 listings. Each listing sets forth standards for measuring a different medical condition. If a claimant meets a listed impairment standard he is presumed to be disabled. The Secretary does not attempt to determine whether an individual, despite even greater limitations, is a Readers Digest unforgettable character who, triumphing over all adversity, can be a productive member of the work force despite those limitations. He has decided that the effort to accomplish that individualized result would be excessive and he accepts the presumptive disability arising from meeting a listed impairment. Plaintiffs, of course, and as they must (since it is, to that point, a clearly rational process), do not contest that methodology.

It is not necessary, moreover, that the claimant meet a listed impairment. It is

---

**2.** Because we hold that plaintiffs were wrongfully denied benefits under statutory law, we do not rule on their constitutional claims.

**3.** After the filing of the third amended complaint, plaintiff Larry Rhyne's application for wage earner's benefits was remanded by agreed order. Since that time the Secretary has determined that he is entitled to benefits. While we do not discuss his case *infra* on issues for remand, the details of wage earner disability claims remain relevant for purposes of class-wide relief.

enough that his condition be medically equivalent to a listed impairment. Plaintiffs argue, with some force, that the meaning of medical equivalence is somewhat obscure and is poorly understood. That does not lead, however, to the conclusion that the concept is for that reason a violation of the statutory mandate. It does mean that a court should pay careful attention to what the methodology at that point really means.

The Listings specify medical criteria: breath capacity, joint motion, hearing ability and the like. They do not, in and of themselves, measure functional ability to stand, sit, follow instructions, lift or accomplish other of the tasks which may be necessary to engage in gainful activity. Plaintiffs contend that, for that reason, they are deficient to determine whether a person is disabled, and that determination is what is required by statute. The Secretary's response is twofold. The first is that medical equivalence, and the Listings themselves, are pregnant with the concept of functional limitation. Indeed, there are special listings for children precisely because the disabilities for children can be special. The medical equivalence concept permits an evaluation of impairments which do not meet the Listings but which are equally disabling. It is a rational system devised by the Secretary to determine child and spousal disability, and the preference of plaintiffs, or a court for that matter, for another methodology is not enough to invalidate the system the Secretary has chosen. Second, for wage earners, for whom the entitlement is less restricted, step three is not the last sieve. If a wage earner's impairments do not meet or are not medically equivalent to a listing, the Secretary determines what this claimant's residual functional capacity ("RFC") may be and whether, in light of that capacity and his vocational factors, the claimant is disabled.

The role of RFC has figured prominently in the voluminous submissions to this court, and the arguments concerning it have somewhat skewed the debate. It is a term of art which the Secretary has adopted to carry out his statutory mandate; it is not a creature of statute. Plaintiffs

argue that RFC is different from functional limitation and that, in practice, its usefulness in assessing a wage earner's functional limitations is tainted by the simultaneous consideration of vocational factors. They contend that a wage earner with positive vocational factors is inevitably denied benefits despite his impairments, if those impairments do not meet or are not equivalent to a specified listing. The Secretary denies that is so and contends that plaintiffs' assumed restrictions on the use of RFC in the evaluation process arises from a misunderstanding of the Secretary's procedures. He insists that RFC is used to measure functional limitations (although not to measure medical equivalence) and, for wage earners, RFC plays a major role in conjunction with vocational factors to determine wage earner disability. At the same time he contends that RFC is somehow more than and different from a solely medical assessment (despite his own pronouncement to the contrary), that it intrudes into vocational factors, and that it therefore need not be considered for child and spousal entitlements.

■ The disputed role of RFC precludes summary judgment for plaintiffs on wage earner claims. We cannot conclude, on the present record, that the undisputed facts establish that functional limitations are not appropriately considered by the Secretary in determining wage earner entitlements. Child and spousal entitlements are another matter.

The Court of Appeals for the Third Circuit has recently, in *Zebley v. Bowen*, 855 F.2d 67 (3rd Cir.1988), decided the primary issue here in favor of a similar child class. Perhaps we need do nothing further here for that group. Because, however, this case remains here, because our conclusions parallel the conclusions there, and because the class is broader here, we proceed.

We proceed first by drawing distinctions between medical conditions, functional impairments (whether or not RFC means the same thing) and vocational factors. A determination of lung capacity is an assessment of a medical condition. The ability of

a person to engage in a level of activity for a defined period in light of a pulmonary impairment is a medical judgment. What level of activity is necessary to engage in gainful activity, and the extent to which that capacity may be impacted by vocation factors are matters beyond medical expertise. Plaintiffs do not dispute that the Secretary has the responsibility to determine what levels of functional impairment preclude gainful activity. What they do contend is that the Secretary has a statutory responsibility to determine, individually, the severity of the impairment, and this court agrees.

The Secretary contends that he does, individually, assess wage earner impairment, and that may be so. He contends that his methodology, through the Listings and the concept of medical equivalence, equates functional limitations to a work setting far better than plaintiffs appreciate. That may be so. For example, obesity in combination with hypertension and joint impairment would appear to be interactive impairments which, if considered by an "equal to" standard, do relate to impairment level. Obesity and some hearing loss would not appear to be interactive and the combination may well not affect the impairment level. The difficulty, though, is that a system based on medical condition pigeonholes, and medical conditions which can be evaluated solely within the context of those pigeonholes, does not necessarily determine whether a specific person has functional impairments which preclude him from engaging in gainful activity. But that is the determination Congress has directed the Secretary to make.

The Secretary bolsters his position by pointing to the statutory authority respecting spouses. Spousal disability requires impairment of a level of severity which "under regulations prescribed by the Secre-

tary ... is deemed to be sufficient to preclude an individual from engaging in any gainful activity." That language is not applicable to child entitlements. More importantly, no one disputes the Secretary's responsibility to determine what *level* of functional impairment precludes gainful employment. That is, however, a different (and different kind of) question than what the functional impairment of a specific person may be.

■ The Secretary has ample authority to use his present sieves to decide who is entitled. As the Secretary has noted, the Listing methodology is an administratively efficient evaluation tool useful in readily identifying individuals whose medical conditions are so severe that they are unable to engage in any gainful activity. That does not mean, necessarily, that he has the statutory authority to conclude that anyone who is not thereby determined to be entitled is therefore *not* entitled. He has the obligation to ask another question when determining the entitlements of child and spousal claimants: if the claimant does not have medical conditions which meet or are equal to administratively determined Listings, are the claimant's impairments so disabling that, even if he were otherwise employable by age, education and experience, he could not engage in gainful activity. It may be, if the Secretary is correct, that the answer to that question would not significantly enlarge the number of persons entitled to benefits. It is an answer, however, which this court believes Congress has directed the Secretary to determine. We turn then to a more detailed consideration of the reasons for that conclusion.

*Statutory Provisions*

■ Congress has placed the responsibility for determining disability [4] with the Sec-

---

4. Congress initially recognized the problems of disabled workers in the 1954 amendments, Pub. L. 83–761, to the Social Security Act. Those amendments created a "freeze" program whereby wage earners would continue to receive coverage despite the fact that their disability prevented further contribution to the Social Security system. The Social Security Act was amended again in 1956 in order to provide direct cash benefits to insured disabled persons, as well as to disabled children, aged 18 and over, of retired or deceased workers, if the child's disability began before the age of 18. Social Security Amendments of 1956, P.L. 84–880, § 103(a), *reprinted in* 1956 U.S.Code Cong. & Ad.News 942, 952. Amendments in 1958 provided for cash benefits to dependents of disabled wage earners.

retary and, for our purposes, has defined disability as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has or can be expected to last for a continuous period of not less than 12 months....

42 U.S.C. § 423(d)(1)(A). Congress drafted a distinct standard for each of the three categories of claimants: wage earners, spouses of wage earners, and childhood SSI claimants. For a wage earner, the statute requires that the Secretary determine if the claimant's

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy....

42 U.S.C. § 423(d)(2)(A). Subsection B of that section sets forth the standard for granting benefits to spouses:

> A widow, surviving divorced wife, widower, or surviving divorced husband shall not be determined to be under a disability ... unless his or her physical or mental impairment or impairments are of a level of severity which under regulations prescribed by the Secretary is deemed to be sufficient to preclude an individual from engaging in any gainful activity.

For a spouse, then, the requisite findings for determining disability are more restrictive than for a wage earner, in two ways: first, the statute requires the Secretary to find inability to do *any* gainful activity, as opposed to substantial gainful activity; and, second, Congress has excluded from

consideration the vocational factors of age, education and experience.[5]

Amendments to the Social Security System in 1972 established, for the first time, Supplemental Security Income—a national welfare program which provides cash benefits to needy disabled persons, in addition to their disability benefits. For adults, the SSI program adopted the definition of disability for wage earners set forth in 42 U.S.C. § 423. For younger SSI claimants, the statute provides that a child under the age of 18 be considered disabled

> if he suffers from any medically determinable physical or mental impairment of comparable severity.

42 U.S.C. § 1382c(a)(3). As with the determination of spousal disability, Congress excluded consideration of the vocational factors of age, education and past work experience, since these groups generally have "not had enough attachment to the labor force to make application of such factors feasible." *Hinckley v. Secretary of Health and Human Services,* 742 F.2d 19, 22 (1st Cir.1984) (quoting Senate Finance Committee "The Supplemental Security Income Program," 95th Cong., 1st Sess., at 125 (Comm.Print 1977)); *Powell by and through Powell v. Schweiker,* 688 F.2d 1357, 1362 (11th Cir.1982) (same).

For all three categories of claimants Congress requires the Secretary to consider the combination of impairments in adjudicating disability benefits:

> In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Secretary shall consider the combined effect of all of the individual's impairments without regard to whether

---

**5.** Benefits to spouses of wage earners was first provided for in the 1967 amendments to the Act. The Senate version defined disability without regard to the statutory vocational factors, but did not distinguish between "substantial" and "any" gainful activity. The Senate Report accordingly stated that the amendment would provide benefits

> for certain disabled widows (including surviving divorced wives) and disabled dependent widowers under a test of disability that is

somewhat more restrictive than that for disabled workers and childhood disability beneficiaries.

S.R. No. 744, Cong.Sess., *reprinted in* 1967 U.S. Code Cong. & Admin.News 2834, 2883. The House committee wanted an even more restrictive definition and the conference committee adopted the House version, providing benefits to only those widows who can show an inability to engage in any gainful employment.

any such impairment, if considered separately, would be of such severity. If the Secretary does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process.

42 U.S.C. § 423(d)(2)(C). This subsection was added by the 1984 Amendments to the Act, Pub.L. 98–460, § 4(a)(1), in response to criticism of the Secretary's practice of evaluating each individual's distinct impairments separately. Congress believed that this process did "not represent a realistic policy with respect to persons with severe impairments which may in many cases interact and effectively eliminate the person's ability to work." H.R.Rep. No. 98–618, 98th Cong., 2d Sess. 14 *reprinted in* 1984 U.S.Code Cong. & Admin.News 3038, 3051. *See also* H.R.Confr.Rep. No. 98–1039, 98th Cong., 2d Sess. 30 *reprinted id.* at 3088. The express requirement that the Secretary consider the combined effect and combined impact of an individual's impairments is consistent with the intent that the functional limitations of each individual claimant be realistically assessed.[6] *Cf. Bowen v. Yuckert*, 482 U.S. 137, 107 S.Ct. 2287, 2293 (majority opinion) and 2304, 96 L.Ed.2d 119 (dissenting opinion) (both acknowledging that the Social Security Act requires a "functional approach to determining the effects of medical impairments").

*Regulations of the Secretary*

The Secretary follows an often repeated five-step process for adjudicating disability claims of wage earners, and separate process for adjudicating the claims of spouses and children. This class action focuses on the listed impairments—step three for wage earners, the final step for spouses and children:

> The Listing of Impairments ... contains over 100 medical conditions which would ordinarily prevent an individual from engaging in *any* gainful activity. The Listing helps to assure that determinations or decisions of disability have a sound medical basis, that claimants receive equal treatment throughout the country, and that the majority of persons who are disabled can be readily identified.... The level of severity described in the Listing is such that an individual who is not engaging in [substantial gainful activity] and has an impairment or the equivalent of an impairment described therein is generally considered unable to work by reason of the medical impairment alone.

Social Security Regulation (SSR) 82–56.[7]

Where a wage earner is not engaged in substantial gainful activity (step one), has a severe impairment (step two) but does not meet or equal the criteria in the Listings (step three), the Secretary then assesses the claimant's residual functional capacity (RFC), or, as explained to claimants by the Secretary, "[W]hat you can still do despite your limitations". 20 C.F.R. § 404.1545(a). The Secretary's interpretive ruling states that a claimant's RFC is a

---

**6.** The House Report also overviews the standards of disability in the context of the Secretary's regulations:

> [T]he committee is concerned that the consideration of eligibility for disability benefits be conducted using criteria that clearly reflect the intent of Congress that *all those who are unable to work* receive benefits. It is of particular concern that the Social Security Administration has been criticized for basing terminations of benefits solely and erroneously on the judgment that the person's medical impairment is "slight," according to very strict criteria, and is therefore not disabling, without making any further evaluation of the person's ability to work.
>
> While the committee understood the Secretary's need for administration efficiency, and also did

not wish to upset the sequential evaluation process, discussed *infra*, the committee noted that the Secretary had plans to revise the regulations relating to non-severe impairments and urged that all due consideration be given to revising those criteria to reflect the real impact of impairments upon the ability to work.

H.R.Rep. 98–618, *supra* at 7–8, *reprinted in* 1984 U.S.Code Cong. & Admin.News, *supra* at 3044–45.

**7.** Social Security regulations are interpretative rulings of the regulations or statements of policy promulgated by the Secretary and are binding on all Social Security Administration personnel (Pl.Stmt.Mat.Facts p. 3).

medical assessment of what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s). RFC is the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs.

SSR 83–10. The Secretary compares the claimant's RFC to the vocational requirements of his or her previous work (step four). If the claimant's limitations prohibit the performance of such past work, the Secretary then determines whether, given the claimant's age, education and work experience, other jobs exist in the national economy which the claimant can do (step five).

While the RFC assessment measures functional capacities in a vocational setting, it is a *medical* appraisal and must be distinguished from evaluation under statutory vocational factors such as the claimant's age, education, and work experience. Although the Secretary stresses here the vocational side of the RFC assessment (Sec. Cl.Memo. at 15), it is a long held understanding in the Social Security Administration that an individual's performance in a vocational setting and the vocational factors used to determine disability are wholly separate concepts.[8] The RFC assessment is used to realistically determine the extent of the medical impairment by reference to the capacity of the individual in a work-like environment, but does *not* evaluate vocational factors to determine the extent of the person's ability to work.

Despite the fact that an RFC assessment is a medical determination, the Secretary prohibits use of this concept in determining benefit eligibility for spouses and children, and instead employs only the Listings and

the notion of medical equivalence. 20 C.F. R. § 404.1578:

**How we determine disability for widows, widowers, and surviving divorced spouses** ... We will find that you are disabled and pay you ... benefits if ... [y]our impairment(s) has specific clinical findings that are the same as those for any impairment in the Listing of Impairments in Appendix 1 or are medically equivalent to those for any impairment shown there....

If a spouse or child claimant does not meet or medically equal the specific criteria he will be denied benefits—the "medical eqivalence" determination, then, is the linchpin of his claims. The Secretary promulgated the following interpretation of medical equivalence:

To determine whether an impairment or combination of impairments is of severity equivalent to a Listed impairment, the set of symptoms, signs, and laboratory findings in the medical evidence supporting a claim must be compared with the set of symptoms, signs, and laboratory findings specified for the listed impairment most like the individual's impairment(s). The impairment(s) may be judged to be equivalent to a Listed impairment only if the medical findings (defined as a set of symptoms, signs, and laboratory findings) are at least equivalent in severity to the set of medical findings for the listed impairment. In no instance will symptoms alone justify a finding of equivalence....

Equivalency can be found under three circumstances:

1. A *listed* impairment for which one or more of the specified medical findings is missing from the evidence but for which other medical findings of equal or greater clinical significance and relating to the same impairment

---

**8.** The Secretary determines the physical exertional requirements of work in the national economy by reference to job classifications, *i.e.,* sedentary, light, medium and heavy, employed in the Dictionary of Occupational Titles, a Department of Labor publication. *See* 20 C.F.R. § 404.1567. The determination of one's RFC depends upon medical impairments. The Secre-

tary further determines whether substantial employment exists in the job markets which wage earners can perform, given their work experience and the exertional level of work which they can perform. The determination of a claimant's vocational factors is unrelated to the RFC assessment.

are present in the medical evidence.[9]

2. An *unlisted* impairment, in which the set of criteria for the most closely analogous listed impairment is used for comparison with the findings of the unlisted impairment.

3. A *combination of impairments* (none of which meet or equal a listed impairment), each manifested by a set of symptoms, signs, and laboratory findings which, combined, are determined to be medically equivalent in medical severity to that listed set to which the combined set can be most closely related.

(SSR 83–14) (emphasis in original). In determining "medical equivalence," the Secretary prohibits consideration of claimant's functional limitations, and does *not* allow consideration of the combined *effect* of the individual's impairments:

As in determining whether the listing is met, it is incorrect to consider whether the listing is equaled on the basis of an assessment of *overall* functional impairment. The level of severity in any particular listing section is depicted by the *given* set of findings and not by the degree of severity of any single medical finding—no matter to what extent that finding may exceed the listed value.

The mere accumulation of a number of impairments also will not establish medical equivalence. When an individual suffers from a combination of unrelated impairments, the medical findings of the combined impairments will be compared to the findings of the listed impairment most similar to the individual's most severe impairment. The functional conse-

quences of the impairments (i.e., RFC), irrespective of their nature or extent, *cannot* justify a determination of equivalence.

*Id.* (emphasis in original).

Although the Secretary's interpretive rulings on medical equivalence does not allow for the consideration of the combined impact of multiple impairments, his regulations, promulgated pursuant to 42 U.S.C. § 423(d)(2)(C), seem to require such consideration.

In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 404.1523.

*The Listings History*

█ A detailed historical review of the Listings shows that they were never intended to be used as a basis for denial of disability benefits. As the Listings were originally promulgated, and as they have been repeatedly revised, the drafters have understood their medical criteria to be a tool in the efficient administration of the

---

9. The Secretary provides a sample for allowing benefits under this step in DI 26515.010 of the Program Operations Manual System References:

Dr. Green, the treating physician, states ... that the claimant continues to complain of shortness of breath and swelling of her legs since discharge. [S]he was visably dyspneic after climbing onto the examining table. There was no neck vein distention or pulmonary rales, but lower extremity edema persists. An ECG revealed atrial fibrillation and digitalis effect. A radionuclide ventriculogram revealed a left ventricular ejection fraction of 27 percent. Renal function was unchanged.

Although the claimant continues to demonstrate dyspnea and edema of the lower extremities, the demonstrated ECG tracing findings do not match or exceed the ECG criteria for either Listing 4.02B.2, C, or D2. However, the radionuclide ventriculogram ejection fraction of 27 percent is determined to be the medical equivalent of the ECG criteria and, consequently, the impairment is determined to be the equivalent in severity to that reflected in Listing 4.02B. Disability is established as alleged.

disability program by screening for clearly disabled individuals—not as the dispositive step for persons who otherwise might be unable to engage in gainful activity.

The Listings were initially unpublished "medical guides" issued and revised by the Bureau of Old–Age and Survivors Income ("BOASI"), with the assistance of the Medical Advisory Committee.[10] An October 1959 report of that committee to the Social Security Administration reiterated the fact that these "guides" were not the dispositive step in disability determinations:

> The medical description of severity of impairment serve as guides to professional judgment in assessing the specific facts in each individual case and the effect of the impairment upon the applicant's ability to function, i.e., his ability to engage in substantial gainful activity. Thus, the guides *are not to be applied mechanically*, but do provide the framework in which professional judgment can operate. *They facilitate identification of clear-cut cases.* Conditions that fall short of the severity of those described in the guides are evaluated in terms of whether in fact they prevent the applicant from engaging in any substantial gainful activity.

*Administration of Social Security Disability Insurance Program*, 1959: *Hearings Before the Subcommittee on the Administration of the Social Security Laws of the House Committee on Ways and Means*, 86th Cong., 1st Sess. 334 (1959) (hereinafter "1959 Disability Insurance Hearings") (emphasis added). Dr. William Roemmich, BOASI, stated at the hearings:

> The guides are not based on the "average man" concept, but rather are placed at a level of somewhat greater severity, where we believe it to be entirely reasonable that an individual so impaired would have medical justification for not working. We believe these guides enable us

to adjudicate quickly and uniformly those applicants who clearly meet the impairment characteristics as defined by the law. A claimant whose evidence shows that his impairment obviously is not the cause for not working can be easily excluded without using guides. These two techniques—allowing those who meet or parallel the level of the guides and excluding claimants with short duration and minimal impairments—limit more extensive development and evaluation to a smaller segment of claims.

> I would like to emphasize that the guides are not now, and were at no time in the operation, intended to separate all applicants into allowances and denials. We know that capacity to work is not just black of white....

> [The] specific medical listings and guides in our operating manual ... are administrative tools, rather than rules. They contain, in broad terms, clinical descriptions of the more common disabling conditions. They do not show all possible disabling conditions nor do they indicate the combining effect of different impairments.

*Id.* at 342.

Assistant Director in Charge of Division of Disability Operations, Arthur E. Hess, testified that

> [t]hese standards are set at a level of somewhat greater severity only because we needed to have standards just as Dr. Roemmich says, for adjudication—where we could get a presumptive allowance. The standards do not create a presumption of conclusive denial. They are an area of presumptive allowance where we say if the evidence shows you are in this area and the individual is not working and there is not this unusual or strong factor to the contrary, the allowance is reasonable. The converse is not true, the man will not be disallowed because

---

**10.** These guides were not initially available to the general public or to outside medical sources since the Medical Advisory Committee believed that "the medical guides, standing alone, [were] inadequate to communicate fully the bases for decisions and should, therefore, be restricted to official use." 1959 Disability Insurance Hear-

ings, *infra* at 335. It was not until prodding by the Subcommittee on Administration of the Social Security Laws of the House Committee on Ways and Means, under the chair of Hon. Burr P. Harrison, that the guidelines were released to the public.

he does not come up to the level of the standards.

*Id.* at 350. As the testimony makes clear, the doctors and administrators who drafted the guides never intended them to allow for "cookbook adjudication." *Id.* at 85.

Regulatory revisions of the Listings since their publication have not altered the limited underlying perception of their use.[11] Indeed, the Secretary's published responses to comments on the regulations exhibit a belief that the Listings screen out clearly disabled individuals but do not provide a procedure for properly determining whether an individual is not disabled. In these statements the Secretary has presumed that a realistic determination of the level of severity of a claimant's impairments must await an RFC assessment. *See, e.g.,* 44 Fed.Reg. 18178 (March 27, 1979) (responding to comments that the Listings do not allow for adjudication on an "individualized" basis); 45 Fed.Reg. 55576 (August 20, 1980) (responding to comments that the concept of medical equivalence standards were too restrictive). We present some examples below. Because they arise only in areas where public comments have shown the Listings to fall short of the statutory mandate, they are not exhaustive.

One commenter in 1979 suggested that the agency

expand the criteria for multiple sclerosis to include the overall impact of the diverse manifestations of this condition, including loss of balance, visual disturbance, intension tremors, weakness of the limbs, and loss of coordination.

The agency responded:

As the commenter points out, multiple sclerosis, a disease with variable and multiple manifestations, can be shown to be a severe impairment by a combination of symptoms and signs other than those described by the Listed criteria. It is not possible, however, to reduce these multiple manifestations to a listing. The Listing is but one item in the evaluation process. We evaluate cases of claimants whose conditions do not meet or medically equal the criteria of a listed impairment under other rules....

44 Fed.Reg. 18176. The response notes that the other rules consider the claimant's statutory vocational factors but does not recognize that these "rules"—as they now stand—would not help a claimant for spousal or child benefits who was totally disabled by the combination of symptoms and signs of multiple sclerosis.

A set of comments further suggested that criteria for narcolepsy be included in the Listings. There the agency responded:

We share the commenters' concerns about the evaluation of narcolepsy and other sleep disorders. However, we do not agree that it should be added to the Listing at this time. Our experience shows that a detailed, individual approach is necessary to evaluate narcolepsy....

*Id.* While sleep disorders came up again six years later in a notice-and-comment dialogue, the Secretary continues to consider, without implementation, how to appropriately revise the Listings. *See* 50 Fed.Reg. 50068 (Dec. 6, 1985).

Disability claims based on mental disorders present another area where the agency itself recognizes that the Listings are inappropriate for determining the full effect of a claimant's medical impairments.[12]

---

**11.** The Listings were published as an appendix to the Secretary's regulations in 1968, 33 Fed. Reg. 11,741 (August 20) (codified at 20 C.F.R. Part 404). While the Secretary revised the Listings in 1979 and 1985 (the Listings remained relatively unchanged in the August 20, 1980 rules recodification, *see* "Staff Data and Materials to the Social Security Disability Insurance Program" 1982 *Senate Committee on Finance,* 97th Cong., 2d Sess. 105 (Comm.Print 97–16)), to reflect advances in medical treatment and diagnosis, the Secretary did not then, and does not now, state that the revisions lowered the level of severity reflected in the Listings. Indeed, the congressional committee, in enacting "medical improvement standards," Pub.L. 98–460, § 101, specifically noted that if the standards for evaluating disability have changed at all, they have increased the burden on the claimant to show disability. *See* H.R.Rep. 98–618, *supra* at 11, *reprinted in* 1984 U.S.Code Cong. & Admin.News at 3048.

**12.** Section 5 of the 1984 amendments, Pub.L. 98–460, *codified* 42 U.S.C. § 421 note, imposed a moratorium on mental impairment reviews un-

In all but two categories of mental impairments—12.05 and 12.09—the Listings require the claimant to meet a set of clinical findings (paragraph A criteria) and two or three tests for functional restrictions (paragraph B criteria).[13] The "B" criteria evaluate the claimant's activities of daily living (B1), social functioning (B2), concentration and task performance (B3), and deterioration and decompensation (B4). It is clear, however, that the mental impairment Listings were not intended fully to evaluate a claimant's ability to engage in work activity. For example, in response to a criticism that the Listings do not measure a person's ability to concentrate and perform tasks for an eight-hour day, the agency responded that the "extent to which a claimant may be capable of sustained performance should be discussed as a mental RFC issue," and, in response to another comment, "[m]ore refined measures of performance in work or work-like settings are included in the mental RFC assessment." 50 Fed. Reg. 35043 (Aug. 28, 1985). *See also id.* at 35044 (response to comment on deterioration in work setting); *id.* (response to comment on claimant meeting one "B" criterion).

Repeated examples of the *agency's own belief* that the level of the claimant's impairments cannot be fully assessed in the Listings and require further inquiry under the medical equivalence and RFC analyses,

are found elsewhere in the record. *See, e.g.,* 50 Fed.Reg. 50075 (Dec. 6, 1975) (arthritis in multiple hand joints); *id.* (ankle arthritis); *id.* at 5077 (pulmonary vascular disease); *id.* at 50080 (severe heart disease).

All this is not to criticize the Listings themselves, and plaintiffs do not contend here that the Listings are arbitrary and capricious determinations of legislative facts. Indeed, the Listings play an essential role in the Secretary's responsibility to promulgate regulations which will ensure uniformity and efficiency in eligibility determinations in what is "probably the largest adjudicative agency in the western world",[14] *see Heckler v. Campbell,* 461 U.S. 458, 461, 467, 103 S.Ct. 1952, 1954, 1957, 76 L.Ed.2d 66 (1983). However, as we shall see, the use of these Listings for purposes which were never intended, and which result in direct circumvention of congressional mandate, cannot be sustained under the law.

### Adjudicatory and Legislative Facts

 Denial of benefits to Social Security disability claimants solely because they do not meet or equal the medical criteria in the Listings cannot be supported by substantial evidence since Congress requires more than what this "cookbook adjudication" allows.[15]

---

til the agency revised the Listings to "realistically evaluate the ability of a mentally impaired individual to engage in substantial gainful activity in a competitive workplace environment." In the legislative history of that section, the House Committee noted:

> Serious questions have been raised by Federal courts, professionals in the fields of psychiatry and vocational counsel and the General Accounting Office about the adequacy of SSA's Listing of Mental Impairments and the appropriateness of SSA's current methods for assessing residual functional capacity and predicting ability to work in individuals with mental impairments. While the validity of all these criticisms may be subject to some debate, it is clear that in many cases individuals have been improperly denied benefits.

H.R.Res. No. 98–618, *supra,* at 15, *reprinted in* 1984 U.S.Code Cong. & Admin.News, at 3052. The revised Listings of mental disorders were published on August 28, 1985 at 50 Fed.Reg. 35038 accompanied by responses to public com-

ments. *See* 20 C.F.R. Part 404, Appendix 1, § 12.00 *et seq.*

**13.** Although the Listings incorporate findings of functional restrictions, they were not intended to circumvent the Secretary's evaluation of the claimant's RFC, which, in the case of wage earners under current regulations, continues to be mandatory if the Listings are not met. *See* 50 Fed.Reg. 35043 (Aug. 28, 1985).

**14.** J. Mashaw, C. Goetz, F. Goodman, W. Schwartz, P. Verkuil & M. Carrow, Social Security Hearings and Appeals xi (1978).

**15.** To the extent that the regulations purport to deny disability to claimants whose functional limitations are of a level of severity which precludes gainful activity, we believe they exceed the Secretary's statutory authority and are arbitrary and capricious. Courts are, however, customarily called upon to review the denial of a specific claim. If the claim has been denied solely by reference to the Listings and without

One route to understanding why the Secretary's analyses of spouse and children claimants fall short of the statutory mandate is found in the distinction between adjudicatory and legislative facts.[16] Broadly speaking, adjudicatory facts relate to the individual capacities and impairments of a claimant. Legislative facts are general facts which are not unique to the individual claimant. For example, exertional requirements in particular jobs and the state of the national labor markets—findings incorporated into the Secretary's medical-vocational guidelines (the "grid"), 20 C.F.R. Part 404, Subpart P, Appendix 2—are legislative facts particularly appropriate for the administrative rulemaking process. While modern administrative agencies often combine both types of factfinding in carrying out their governmental roles, the law will not permit agencies to escape their adjudicatory responsibility by appealing to a legislative function.

In *Heckler v. Campbell,* the Supreme Court upheld the Secretary's use of the grid, noting that

> the statutory scheme contemplates that disability hearings will be individualized determinations based on evidence adduced at a hearing. ... But this does not bar the Secretary from relying on rulemaking to resolve certain classes of issues. The Court has recognized that even where an agency's enabling statute expressly requires it to hold a hearing, the agency may rely on its rulemaking authority to determine issues that do not require case-by-case considerations.

any determination of whether the claimant's functional limitations are of a level of severity which precludes gainful activity, the denial is not supported by substantial evidence. We discuss the issues here in that context while recognizing that we are considering what we believe to be an overly truncated methodology.

16. The adjudicatory/legislative fact-finding distinction is a constitutional principle of construction in administrative law largely attributed to Professor Kenneth Culp Davis' work, *An Approach to Problems of Evidence in the Administrative Process,* 55 Harv.L.Rev. 364 (1942). The distinction is now widely accepted as guiding principles for deciphering modern welfare state legislation and has been repeatedly employed in the Social Security disability context. *See Broz*

461 U.S. at 467, 103 S.Ct. at 1957 (citations omitted). Because the grid resolved factual issues which did not relate to the individual predicament of the claimant, the Secretary's regulations comport with the statutory mandate. The findings made by the grid rules were "legislative facts," and its use did not interfere with the Secretary's responsibility to determine *de novo* the "adjudicatory facts" in each claimant's claim, and there was no circumvention of the statutory mandate. The Court therefore upheld the Secretary's use of the grid.

Here the Secretary must determine the ultimate issue of disability based upon a series of adjudicatory fact-findings, *see* 42 U.S.C. § 423(d)(5)(B), and the Secretary may rely upon regulations which incorporate legislative facts only to the extent that they do not unduly impair his adjudicatory responsibilities. The statute and the regulations contemplate a set of analytical steps in making the disability determination. The administrative law judge ("ALJ") considers those symptoms which are supported in the medical record by specific medical signs and laboratory findings, to determine the full medical condition of the claimant. *See* SSR 82–58. The medical condition includes the claimant's anatomical, physiological, and psychological abnormalities. From this condition the ALJ adduces the severity level of the claimant's impairment or combination of impairments. Once the level of severity is found, based upon these individualized determinations, the Secretary determines disability according to the

*v. Schweiker,* 677 F.2d 1351, 1357–61 (11th Cir. 1982), *modified on other grounds sub nom., Broz v. Heckler,* 721 F.2d 1297 (11th Cir.1983). *See also United Air Lines, Inc. v. C.A.B.,* 766 F.2d 1107, 1118 (7th Cir.1985) (discussing distinctions in the area of antitrust); *Sherwin v. Secretary of Health and Human Services,* 685 F.2d 1, 4 (1st Cir.1982) *cert. denied sub nom. Picard v. Secretary of Health and Human Services,* 461 U.S. 958, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983) (discussing issue presented in *Broz* ); *Rivers v. Schweiker,* 684 F.2d 1144, 1156 (5th Cir.1982) (same); *People of State of Illinois v. United States,* 666 F.2d 1066, 1073 (7th Cir.1981) (review of Interstate Commerce Commission decision).

statutory standards recited in 42 U.S.C. § 423(d).

While the Secretary employs rules which incorporate facts not unique to the claimant's particular level of impairment, all of the steps up to and including the measurement of the claimant's level of severity of impairments determine adjudicatory facts which the statute requires be made on an individualized case-by-case basis.[17] The Secretary may turn to administrative rules to determine whether the claimant is disabled only after the essential adjudicatory facts are found.

In determining whether a spousal or child claimant is disabled, however, the Secretary circumvents his statutory duty to determine the level of severity. The medical criteria of the Listings, as we have seen, were not intended to be used to deny claims but only to screen out clearly disabled individuals. By the Secretary's own admissions, it is clear that the Listings do not cover all medical conditions and impairments, do not measure the combined effect and impact of the claimant's impairments, and indeed do not make the more individualized inquiries into the full array of signs, symptoms and findings *for the listed impairments* to get a realistic evaluation of a person's ability to work.

*Medical Equivalence*

The Secretary attempts to salvage the regulatory framework by reference to the concept of medical equivalence, as set forth *supra* at 372–73. He claims that the Listings set the level of severity where claimants are deemed to be unable to engage in any gainful employment by reason of that impairment. He further states that the medical equivalence determination allows him to compare the level of a claimant's unlisted impairment, and combination of impairments, to those in the Listings. If it were true that the Secretary determined the severity level of a claimant's impairment based upon adjudicatory facts, and then compared that level against regulations which find, through rule-making, how levels of impairment relate to the exertional and non-exertional requirements of gainful activity, the Secretary would have strong support for his view that the regulations reasonably implement the terms of the Act. Unfortunately, this is not how the Secretary determines disability.

■ While the Listings identify medical conditions that allow the Secretary to deem the individual unable to work, they do not conclusively measure the extent to which an individual is impaired. Even where the claimant suffers from conditions which are depicted by the Listings, a full understanding of the extent of impairment may require an individualized determination. Where an impairment is not listed, it is even more difficult to see the Listings criteria as dispositive of severity level since the evaluation of medical impairments involves particularized understandings of how medical conditions impair bodily functions and often cannot be translated into the limited clinical indicia of other impairments.[18] Since the Secretary does not al-

---

**17.** This analysis follows the reasoning of the court in *State of New York v. Bowen,* 655 F.Supp. 136, 143 (S.D.N.Y.1987), which reviewed whether the Secretary's use of the treadmill test in the Listings complied with the statutory requirement that disability determinations be made on the record as a whole.

> The Secretary's reliance on treadmill results in certain cases would be perfectly appropriate if the test measured a subject matter (such as jobs in the national economy) susceptible of resolution within a single rulemaking proceeding. *See, e.g., Heckler v. Campbell,* 461 U.S. at 467–68, 103 S.Ct. at 1957–58 (1983). The determination of a claimant's medical condition, by contrast, is necessarily among the most individualized, case-by-case decisions that the Secretary makes. *Id.* at 467,

103 S.Ct. at 1957 (citing 42 U.S.C. § 423(d)(2)(A)).

**18.** Important points relevant to this discussion were made in the Secretary's own Medical Equivalency Study, which was part of the Quality Assurance Review (dated April 27, 1984). Most of the study's data bears little relevancy to the issue presented by plaintiffs' challenge here, since the study analyzed various Disability Determination Services' performances to see whether equivalence determinations were done according to the Secretary's regulations, rather than analyze the equivalency determinations themselves for substantial evidence. However, it did criticize the determinations of combined effects of multiple impairments via the Medical Equivalency concept, stating that the

low consideration of functional capacities or the combined effect of multiple impairments (even though he seems to indicate that he should in 20 C.F.R. § 404.1523), the medical equivalence finding cannot lawfully substitute for the adjudicatory finding of the extent of impairment.[19]

### Spousal Benefits

██ We conclude then that the Secretary's use of the medical equivalency concept, in combination with the Listings, fails to resolve the statutorily-required adjudicatory inquiry. The Act requires the Secretary to determine the level of severity of each individual spouse claimant and then to establish by regulation or otherwise whether that level of severity precludes gainful activity. While Congress intended adjudication of spousal disability claims to be governed by a tougher standard—*any* gainful employment as opposed to *substantial* gainful employment—and did not allow consideration of the individual's vocational factors, it cannot be concluded that Congress intended benefits to be denied without an adjudicatory inquiry into the extent of impairment. Where functional analysis is required, either to determine the severity level of a single impairment or to measure the combined impact of multiple impairments, the Secretary's denial of benefits under current practice must fail.

This holding is consistent with other court opinions reviewing spousal disability claims. In *Tolany v. Heckler*, 756 F.2d 268 (2d Cir.1985), the Second Circuit reviewed a determination that a claimant widow was not eligible for disability benefits because her condition did not meet or equal the Listings. The claimant there suffered from multiple sclerosis, urinary incontinence and hypothyroidism. Because of her condition she needed to urinate between five and ten times per hour, sometimes experiencing painful spasms. The court vacated the ALJ's determination that the claimant was not disabled and explicitly held that the Secretary was required to determine residual functional capacities of widows [20] seeking disability benefits. The court remanded the case back to the Secre-

higher incidence of error is felt to be related to the inherent difficulty of evaluating and then combining the severity of several impairments (as contrasted with evaluating a single impairment), and to the inadequate policy guides which direct a physician to compare two dissimilar impairments to the listing most closely related to them. Unless one of the multiple impairments is clearly predominant, this comparison is not practical, especially when dealing with the situation in which a combination of exertional and nonexertional restrictions is present.

The Secretary's own study notes the difficulty in conceptualizing how a combination of impairments meets or equals the criteria set in the Listings.

**19.** Plaintiffs further claim that the Secretary's use of the medical equivalence determination violates the decision-making requirements of the Act. Disability examiners and staff physicians usually make medical equivalence determinations by checking the "does not meet or equal the Listings" box on the Secretary's pre-printed form SSA 831–U5. These physicians usually neither treat nor examine the claimant, and the Secretary does not require any articulation of the state physician's decision. The lack of explanation for equivalency determination was criticized by the Secretary's Quality Assurance study (*see* note 18) at Major Conclusion 3. Despite repeated contacts with claimant's treating physicians, the Secretary does not request from them a medical equivalence opinion.

The ALJ must determine medical equivalence *de novo* and may give the medical equivalence determination made at the state level "appropriate weight". SSR 83–19. However, the ALJs' expertise in administration does not entitle them to draw independent medical conclusions. *Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir.1985). Where the staff does not articulate a basis for its conclusions, it is difficult to understand how these opinions are entitled to *any* significant evidentiary weight.

The Secretary argues that *Fox v. Heckler*, 776 F.2d 738 (7th Cir.1985) requires the court to approve his use of Form SSA 831–U5. In *Fox*, the Seventh Circuit affirmed a denial of a wage earner's benefits, noting that the staff doctor had reviewed the claimant's record, completed and signed the form, and opined that the claimant's impairments did not meet or equal the Listings. The court there did not, however, hold that the form itself was sufficient evidence for the medical equivalence determination. Instead, the court detailed the ALJ's lengthy explanation as to why the claimant did not suffer from a combination of impairments which rendered him unable to engage in work activity.

**20.** While the court used the term "widow" throughout its opinion, it expressly provided that the rationale would apply to other persons treated similarly by the Act and regulations. 756 F.2d at 27, n. 3.

**380**

tary to determine the claimant's functional ability to perform gainful activity. 756 F.2d at 272. *See also Paris v. Schweiker*, 674 F.2d 707, 710 (8th Cir.1982) ("These claimants are real people and entitled to have their disabilities measured in terms of their total physiological wellbeing") (citing *Landess v. Weinberger*, 490 F.2d 1187, 1190 (8th Cir.1974)); *Williams v. Bowen*, 660 F.Supp. 192, 196 (S.D.N.Y.1987); *Williams v. Bowen*, 636 F.Supp. 699, 704 (N.D.Ill.1986) (ordering the Secretary to make equivalency and combined-effects determinations within the context of plaintiff's ability to function in a normal work environment); *Taggart v. Heckler*, 576 F.Supp. 624, 627 (W.D.Ark.1984).[21]

The Secretary argues that because the statute delegates to him the function of establishing regulations where it can be deemed that spouses are unable to engage in gainful activity, his current practice is consistent with the intention of Congress. We have explained why we believe this is an incorrect interpretation of statutory requirements. The Secretary must find more than the claimant's medical condition—he must measure the severity of the impairment.[22]

*Children SSI Claimants*

If the Listings alone fail to provide substantial evidence for the denial of benefits to spouses, the Listings are equally deficient in producing substantial evidence supporting denials of benefits for child SSI claims. Indeed, since the statute requires evaluation of children claims under the same standard as adult SSI claimants, *i.e.*, the inability to engage in substantial gainful employment standards, it is even more difficult to see how the Secretary can apply the same method he uses to adjudicate spouses' claims, which admittedly require a higher standard. The Secretary points out that there are separate Listings for children, intended to reflect impairments and "disease processes that differ in their effect on children." 20 C.F.R. § 416.925(b). This Listing is published as Part B to Appendix 1 of the regulations. However, the Listings in Part A still apply to children, and the Secretary mandates that the Listings in Part B apply only where the other criteria "do not give consideration to the particular disease process in childhood." Preamble to Part B. The Secretary does not attempt to grapple with the application of inconsistent statutory standards, nor does he address the inherent flaws in the cookbook adjudicatory format of his regulatory scheme. Instead, he repeatedly announces that the determination of a child's RFC would be inappropriate since the statute does not require application of the vo-

---

**21.** The Secretary asks the court to reject the analysis in *Tolany*, *Paris*, *and this court's opinion in* Williams, *arguing that these decisions misunderstood the Secretary's role in regulating disability claims and Congress' express provision allowing the Secretary to set the level of impairment which could be deemed disabling. It is the Secretary, however, who misunderstands those decisions. Congress did not intend deference to the Secretary where he is disloyal to the statutory requirement that the extent of impairment be determined.*

The Secretary further argues from this court's decision in *Hundrieser v. Heckler*, 582 F.Supp. 1231, 1237 (N.D.Ill.1984), where we stated that "Congress defined the requisite level of severity *for widows* by reference to regulations and not to the present functional abilities of the individual claimant." This statement further provided a basis for the decision in *Anderson v. Bowen*, 647 F.Supp. 1453, 1456 (N.D.Ill.1986), although the court there did not review a challenge to the Secretary's regulations.

We acknowledge that the language we used in *Hundrieser* contradicts our position here. In that case, however, we did not review a claim by a spouse, but only used what appeared to be a reading of the spousal benefit provisions as a contrasting example to the Secretary's step two analysis for wage earners. There we did not review the legislative and regulatory history of spousal benefit provisions, nor did we undertake the serious inquiry we do today.

**22.** The rationale behind the statutory "deeming" provision is perhaps related to the Secretary's disability determination practices at the time the spousal program was enacted. In the days before the grid the Secretary used vocational testimony that identified actual job types which wage earner claimants could perform. Congress' express delegation of authority to the Secretary to establish regulations by which spouse claimants could be deemed disabled was intended to allow the Secretary to determine spouse benefits without vocational testimony. It did not intend to relieve the Secretary of his duty to determine the spouse's level of impairment.

cational factors to child SSI claims. This is a *non sequitur.* Determination of the child's functional capacities in light of his or her medical condition—a medical determination—operates separately from step five in the regulatory scheme, which applies a wage earner's vocational factors. *See supra* at 372.

The validity of the Secretary's children SSI regulations were previously addressed in *Powell by and through Powell v. Schweiker,* 688 F.2d 1357 (11th Cir.1982) and *Hinckley v. Secretary of Health and Human Services,* 742 F.2d 19 (1st Cir. 1984). In *Powell* and *Hinckley,* two separate courts of appeals reviewed the Secretary's regulations with respect to children under the age of 18 and determined that the regulations reasonably implemented the Act's provisions. These courts looked to the legislative histories for evidence of approval or disapproval of the Secretary's methods and concluded that the regulations were valid. The dissent in *Powell* unsuccessfully argued that Congress required children disability determinations comparable to adult determinations and that, by not allowing consideration of vocational factors, child claimants were being shortchanged.

Plaintiffs argue that these cases are not controlling since they questioned whether the Secretary must consider vocational factors in determining childhood disability but did not evaluate the regulations in the context of the challenges presented here. This court agrees with plaintiffs that *Powell* and *Hinckley* did not address the inadequacies of the Listings—perhaps because they were not raised. Neither did the courts address the issue of whether there was a substantive difference between the spouse ("any gainful activity") and wage earner ("substantial gainful activity") standards. Those decisions are relevant insofar as they hold that Congress did not require application of vocational factors to child SSI claims. However, Congress did require a determination of impairment severity, which cannot be done on the basis of the Listings and medical equivalency alone.

While the separate Listings apply to children with impairments which are not adequately covered by the Listings in Part A, there is no suggestion that they overcome the inherent inadequacies found in the other Listings. The childhood Listings incorporate some functional criteria, as do the mental impairment Listings in Part A, but they do not cover the entire gambit of disabling childhood medical conditions. Nor is there any evidence that they can determine the combined effect of separate impairments. The children Listings may provide a tool by which clearly disabled children can be awarded benefits, but they do not provide a basis by which a child's claim can be denied.

The Third Circuit, in *Zebley v. Bowen, supra,* 855 F.2d at 73–75, rejected the reasoning in *Powell* and *Hinckley* and concluded that the Secretary's ability to "identify only *some* comparable impairments" by use of the children's Listings "was not enough," (emphasis in original). *Zebley* parallels our holding here and its description of the Secretary's Listings and use of medical equivalence provides support for the claims of the class in its entirety.

*Wage Earners*

The parties recognize that the Secretary evaluates wage earner claimants differently than children and spouses. If a wage earner does not meet or equal the Listings, his claim will be further reviewed under steps three and four. Since the Secretary determines the wage earner's RFC, apparently a negative finding at step three does not automatically result in denial.

Plaintiffs, however, claim that this appearance of process is false. Under the Secretary's medical-vocational guidelines certain wage earners—those with favorable vocational factors—will be found not disabled as long as they can perform the full range of sedentary work. *See* Rules 201.10—201.29. Claimants with favorable vocational factors are those individuals who are under the age of 45, are between the ages of 45 and 50 and are neither illiterate nor unable to communicate in English, or are any age and have had skilled or semiskilled work experience with

transferable skills. Plaintiffs state that under the Secretary's regulations, if a claimant does not meet or equal the Listings criteria he will be assumed to be capable of performing the full range of sedentary work. Therefore, if a claimant has favorable vocational factors and does not meet or equal the Listing, his benefits will be denied.[23] SSR 86–8 states:

> Under the regulations, a finding that an individual's impairment(s) does not meet or equal the Listing effectively indicats that he or she has a sufficient work capability at the sedentary or a higher exertional level, to require medical-vocational evaluation.

This interpretive ruling, plaintiffs argue, substantiates their view that the Secretary does not actually assess an RFC below sedentary work if the claimant passes step three of the sequential analysis. However, the ruling specifies that there must be both a factual medical (RFC) and a vocational evaluation, and plaintiffs' claim is also explicitly contradicted two sentences later:

> If the impairment(s) does not meet or equal the Listing, the rationale *must* reflect the remainder of the sequential evaluation process. If the claimant does not, in fact, have the RFC for a full range of sedentary work, the case must be evaluated within the framework of the vocational rules.

*Id.* (emphasis in original). If the Secretary assumes that an individual who does not meet or equal the Listings actually retains the functional ability to do sedentary work, then the denial of benefits to a wage earner with favorable vocational factors will not be supported by substantial evidence. *See Mental Health Ass'n of Minnesota v. Schweiker,* 554 F.Supp. 157 (D.Minn.1982) (Secretary's presumption that claimants

who do not meet mental impairments Listings retain a sufficient RFC to do unskilled work bypasses statutory mandate to individually assess wage earner's level of impairment) *aff'd in relevant part sub nom. Mental Health Ass'n of Minnesota v. Heckler,* 720 F.2d 965 (8th Cir.1982) (discussed in *Orlando v. Heckler,* 776 F.2d 209 (7th Cir.1985)). This follows our conclusion that denials cannot be lawfully based upon the Listings themselves. But that does not appear to be the Secretary's methodology. We do not, however, reach a firm conclusion in this case. Here the named plaintiff wage earner was denied benefits at step two, but since the filing of this case he has been determined eligible for benefits. We leave to another day, and other courts, the question of whether wage earners with favorable vocational factors are denied benefits on the basis of the Listings alone.

*The Secretary's Authority*

In recent decisions the Supreme Court has not been hospitable to challenges by disability claimants to the Secretary's regulations, explaining that the Secretary's administrative decisions must play a substantial role in the workings of the Social Security disability system. *See Bowen v. Yuckert,* 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (upholding the Secretary's use of the threshold severity test ("Step 2")); *Heckler v. Campbell, supra* (upholding the Secretary's use of the vocational-medical guidelines). *See also Schweiker v. Gray Panthers,* 453 U.S. 34, 101 S.Ct. 2263, 69 L.Ed.2d 460 (1981) (upholding Secretary's ruling allowing states to deem spouse's money available to Medicaid applicants in determining eligibility).[24] As this court has noted, the Secretary's regulations are to be construed to

---

**23.** The parties contest whether it is ever proper to find a claimant not disabled where he cannot perform the full range of sedentary work, despite language to the contrary in *Rousey v. Heckler,* 771 F.2d 1065, 1071 (7th Cir.1985). We need not address this issue here since the question before us is whether the Secretary assumes that those who do not meet the Listings retain the residual functional capacity for sedentary work. If this were true, the Secretary would never find that a claimant who passes step three

has the capacity for some but not all sedentary work.

**24.** We question the relevancy of that decision to the issues raised here. In *Gray Panthers* governmental "deeming" could influence, and obviously was intended to influence, private volitional conduct, a matter of some consequence in the administration of a regulatory scheme. Physical and mental impairments are not so susceptible to private decision making.

carry out the clear intent of statutory language, and those attacking the Secretary's regulations must make out a strong case of inconsistency with the statute if they are to succeed. *Hundrieser v. Heckler,* 582 F.Supp. 1231, 1240–42 (N.D.Ill.1984). The secretary broadly claims that the court should defer to his judgment in the administration of disability benefits, arguing that, since the statute authorizes the Secretary to establish regulations, his decisions are entitled to "legislative effect" (Def.Cl. Mem. at 4, 20, 21, 26). Deference to the Secretary's regulations is, however, proper only where the Secretary exhibits fidelity to the statutory mandate.

While the Supreme Court has concluded that previously challenged regulations are reasonable interpretations of the Social Security Act, this court does not understand those cases to hold that the federal judiciary serves no function in reviewing agency decision. Modern welfare statutory schemes increasingly rely upon delegated authority to make reasoned adjudicatory determinations and to find specific legislative facts in the form of regulatory rules. The federal courts have played an important role in ensuring that agency decisions are not arbitrary and capricious and are based upon the concerns which Congress intended the agency to consider. *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 1220–21, 94 L.Ed.2d 434 (1987); *Chevron, U.S.A. v. National Resources Defense Council Inc.,* 467 U.S. 837, 842–843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *Mohasco Corp. v. Silver,* 447 U.S. 807, 825, 100 S.Ct. 2486, 2496–2497, 65 L.Ed.2d 532 (1980); *United States v. Larionoff,* 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977). Under the arbitrary and capricious standard

> the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made".... Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Ins.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–2867, 77 L.Ed.2d 443 (1983).

In the context of Social Security disability claims the federal courts play a limited and well-defined role. The Secretary, not the courts, adjudicates disability claims. *See Whitney v. Schweiker,* 695 F.2d 784, 786 (7th Cir.1982); *Carver v. Harris,* 634 F.2d 363, 364 (7th Cir.1980); *McNeil v. Califano,* 614 F.2d 142, 145 (7th Cir.1980); *Lahr v. Richardson,* 476 F.2d 1088 (7th Cir.1973). Similarly, it is not the role of the court to instruct the Secretary how to best administer the practices of Health and Human Services. *See Bowen v. Yuckert,* 107 S.Ct. at 2293. Instead, recourse to the federal courts is only to review agency action and to determine whether such action is supported by substantial evidence and comports with the requirements of the Act. It is with this understanding of the court's role that we have analyzed the Secretary's use of the Listings in denying disability claims.

The Court in *INS v. Cardoza–Fonseca* rejected an administrative agency's interpretation of statutory requirements in circumstances strikingly similar to the one here. In that case the Immigration and Naturalization Service ("INS") was given responsibility for adjudicating political asylum claims on a case-by-case basis. Despite the tradition of extraordinary deference enjoyed by the INS, and the discretionary aspect of political asylum grants, the Court ruled that the appropriateness of the standard employed by the agency was "a pure question of statutory construction for the courts to decide." 107 S.Ct. at 1220–21. Although the application of that standard was to be developed by the agency in individual determinations, the Court held that the agency's adjudicatory process did not comport with the language and history of the Immigration and Nation-

ality Act. Underlying the Court's decision was the understanding that when the statute requires an adjudicatory determination by an administrative agency, even where an eligible asylum application could be denied on wholly discretionary grounds, the federal courts must ensure that agency decision comports with the standards and processes contemplated by the enabling provisions.

The controlling principles here are clear. In *Cardoza–Fonseca*, the Court extensively discussed the principles of deference in the context of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, supra. See *Cardoza–Fonseca*, 107 S.Ct. at 1220, n. 29. In *Chevron*, the Court recognized the principles of deference due an agency's interpretation of statutory questions where it can be determined that Congress did not have an intent to resolve those questions. *Cardoza–Fonseca* held that no deference is due when the agency interprets or applies a standard which is inconsistent with congressional intent.[25] The Secretary's use of the Listings does not comport with that intent. Further, as was noted in *Cardoza–Fonseca*, 107 S.Ct. at 1120, n. 30, the inconsistency of the positions that the agency has taken through the years is an additional reason for rejecting the Secretary's request for deference. We have seen that the Listings were not drafted to deny benefits to claimants, yet it is for that purpose that the Secretary now asks for deference. For these reasons, the Secretary's request for deference is inappropriate. *See also Homemakers North Shore, Inc. v. Bowen*, 832 F.2d 408 (7th Cir.1987) (agency opinion, on issue which Congress has tried to settle, is entitled to little force).

Our holding is further supported by *Doe v. Reivitz*, 830 F.2d 1441, 1447 (7th Cir. 1987). There the court held that deference due to the Department of Health and Human Services' interpretation is far less than that due legislative rules. The refusal to consider functional impact in making equivalency determinations, as well as other rules challenged here, are agency interpretations and therefore command less deference from this court.

## CONCLUSION

For the foregoing reasons, we conclude that the Secretary's denial of class members' claim to disability benefits on the basis of the Listings alone does not comport with statutory requirements. This court therefore enters summary judgment in favor of plaintiffs' class. In a separate memorandum and order issued today, we remand the named plaintiffs' cases to the Secretary for determination of their entitlements consistent with this opinion.

---

**25.** One commentator has argued that *Cardoza–Fonseca* marks the tardy recognition by the Supreme Court that an expansive reading of *Chevron* too severely circumscribes a court's function in reviewing an administrative interpretation of a statute. Judicial review of administrative agency interpretations of statutes is vital to the constitutional scheme of separation of powers, and the effectiveness of the judicial check requires that courts carefully examine statutes to determine whether agency interpretations are faithful to congressional intent. There is no readily definable line between clearly expressed congressional intent and intent that is implied in the structure and purposes of a given statute. As one commentator has noted, "Congress rarely addresses precise questions directly, but its failure to do so does not remove all constraints on administrators. Instead, statutes set out general principles that guide and discipline administrative discretion even in unforeseen cases." To restrict a reviewing court's inquiry to an agency's compliance, with express congressional intent, is to remove much force not only from judicial review itself, but also from the legislative power to make law. Many lower courts have interpreted *Chevron* to confine judicial review to only egregious violations of congressional intent by administrative agencies. For courts and commentators uncomfortable with the judicial abdication that *Chevron* appeared to require, *Cardoza–Fonseca* serves as a reminder that searching judicial inquiries into congressional intent in the administrative law context are not obsolete. Note, "The Supreme Court, 1986 Term—Leading Cases," 101 Harv.L.Rev. 349–350 (1987) (footnote omitted).