Aritha PARKS, Plaintiff,

v.

Louis W. SULLIVAN, M.D., Secretary
of Health and Human Services,
Defendant.

No. 90 C 5019.

United States District Court,
N.D. Illinois, E.D.

June 6, 1991.

Deborah Spector, Ellyn Hershman, Spector & Lenz, Chicago, Ill., for plaintiff.

Carol Davilo, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Aritha Parks ("Parks") seeks judicial review of a final decision of Secretary of Health and Human Services Louis Sullivan ("Secretary") denying Parks' claim for social security disability insurance benefits,

disabled widow's benefits and supplemental security income ("SSI") under the Social Security Act ("Act"), 42 U.S.C. §§ 402(d), 416(i), 423(d) and 1383.[1] Each party has filed a motion for summary judgment pursuant to Fed.R.Civ.P. ("Rule") 56.[2] For the reasons stated in this memorandum opinion and order, Parks' motion is granted and Secretary's is denied.

### Facts

*Personal History*

Parks was born in Arkansas on September 14, 1933 and completed school through the eighth grade. She married and had five children, three of whom are still living. Her husband died in 1984.

Parks worked as a packer for Solo Cups from 1962 to 1971. Then she worked as a nurse's aide in a nursing home until 1977. Next she worked briefly in 1977 and 1978 as a bakery custodian, a job in which she had to stand or walk throughout her work day and frequently had to lift or carry up to 25 pounds. Her duties included washing the bowls and pans, cleaning the table, sweeping and mopping the floors, cleaning the freezer and oven, washing the windows and taking out the garbage. Then from 1978 to 1983 she worked as a private duty nurse-companion. In 1983 she stopped working entirely and has not returned to work since.

Parks testified that the reason she stopped working was that she became short of breath easily, had pain in her back, right side and chest and had headaches and that she continues to experience those symptoms (R. 71–73, 79–81, 118–26). Different pain medication prescribed by her doctors over the years has never given her full relief (R. 80, 84, 90, 119–20). She also testified that she can sometimes walk only a block or two before getting tired and can

---

1. All further statutory references will take the form "Section—," using the Title 42 numbering rather than the Act's internal numbering.

2. As described in the next section, the facts of this case are really not in dispute, obviating the need for this Court to preoccupy itself with the difficult task of adopting a Janus-like set of dual perspectives on cross-motions for summary judgment (see *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991), requiring courts dealing with Rule 56 motions to draw "those inferences that are reasonable" in the light most favorable to each nonmovant). All citations to the Administrative Record will take the form "R.—."

lift only 5 to 10 pounds with her left hand but none with her right (R. 127–29). She prepares her own meals, does dishes and dusts, but her son or sister's nurse takes her to the grocery store, does the laundry, takes out the garbage, sweeps and cleans the bathroom (R. 82–83, 135, 139, 143–44, 148). She used to sew, knit, crochet and embroider but no longer does so because of the pain in her hand (R. 82, 144). Though Parks goes to church occasionally, she seldom socializes or otherwise leaves her apartment (R. 141–43, 147).

*Medical History and Evidence*

1. Physical Impairments

From November 1983 through at least April 1987 Parks received treatment from various clinics at Cook County Hospital, including the General Medicine Clinic, the Orthopaedic Clinic, the Back Clinic and the Neurosurgery Clinic (R. 83). Diagnoses over the years included hypertension, degenerative joint disease, right shoulder nerve impingement or rotator cuff tear and atypical chest pain. Parks refused the Back Clinic's recommendations in 1986 that she undergo surgery on her right shoulder and see a psychiatrist about a pain syndrome. Dr. Edward Castro of Cook County Hospital, who treated Parks every 2 to 4 weeks for one year, diagnosed right shoulder anterior impingement syndrome or rotator cuff tear and lower back pain syndrome and felt that Parks could lift and carry less than 5 pounds (R. 300–01). In addition, Parks was hospitalized in 1987 for chest pains and in 1987 and 1988 for left leg pain that was diagnosed both times as thrombophlebitis—on those occasions she was treated so that she improved.

Four physicians examined Parks pursuant to the Secretary's request. Dr. Ashok Shah examined her on January 25, 1985, reaching this opinion as to Parks' physical condition (R. 277):

1) Right leg pain probably related to myalgia[3] or muscle spasms.

2) Low back pain related to lumbosacral sprain and muscle spasms (there were no signs of degenerative changes seen on these x-rays).

3) History of hypertension.

4) Shortness of breath—rule out mild COPD [chronic obstructive pulmonary disease].

5) Chest pain—rule out ischemic heart disease.

Dr. David Daniels examined Parks on August 16, 1985 and made these determinations (R. 289):

1) The patient has low back pain with posture and habitus suggesting right nerve root involvement.

2) Hypertension, well controlled.

3) Chest pain of variable qualities, not relieved by Nitroglycerin. The etiology of which is unclear. On exertion, she has mild dyspnea[4] on exertion with the activity, causing her to rest, which some authorities say is more suggestive of heart disease and lung disease, however, the etiology of her dyspnea on exertion is also unclear.

4) History of tobacco abuse.

Dr. Robert Beswick examined her on August 3, 1987 and made these notations (R. 416):

1) LOWER BACK PAIN

This has been chronic for the last 15 years. The patient did indeed have mild bilateral paralumbar tenderness and could only bend over within eight inches of her toes and walked slowly. She had limited exercise tolerance, although she did not require any assistive devices.

2) HYPERTENSION

This is well-controlled on her current medical regimen.

3) CHEST PAIN

This has been present for three years occurring on a daily basis. There are several atypical features to it and the patient had a suboptimal treadmill test due to her limited exercise tolerance. Although an echocardiogram did show con-

---

**3.** [Footnote by this Court] "Myalgia indicates muscular pain" (*Merck Manual of Diagnosis and Therapy* 1271 (15th ed. 1987)).

**4.** [Footnote by this Court] "Dyspnea" is "[a]n unpleasant sensation of difficulty in breathing" (*id.* at 578).

centric left ventricular hypertrophy, there is no evidence on clinical examination to support congestive heart failure. Finally, Dr. Irving Sherman performed a neurologic consultive examination on Parks on February 29, 1988 and summarized his views this way (R. 452):

> It is my opinion that the patient does not have any objective evidence of organic neurologic disease. There is certainly a great deal of difficulty with her mobility and there are many subjective complaints. Her capacity to cooperate in examining the right side of her body was very limited. My total impression was that we were dealing much more with a functional disorder than anything else. I did not have access to the detailed studies about whether she really had arthritic changes in the right extremities that could account for the immobility. In any case I do not see a neurological problem in this situation. There can very well be some psychological problem.

2. Mental Disorders[5]

Five separate professionals evaluated Parks for mental disorders. First Parks was examined by clinical psychologist Dr. Darrell Snyder at her attorney's suggestion. Snyder concluded (R. 325–26):

> It appears this woman is displaying more frequent pain with greater intensity than could be explained by physical findings. She would display a diagnosis of psycho-

genic pain disorder, 307.80.[6] She also appears to manifest a conversion disorder, 300.11.[7] She did appear to manifest a restricted range of motion and did display some grimaces as well as exclamations of pain when the examiner moved her arm during one examination item.

\*   \*   \*   \*   \*   \*

She also experiences a dysthymic disorder, 300.40.[8]

\*   \*   \*   \*   \*   \*

This is a proud woman who would not accept any psychological reasons for possible infirmities. It is likely that she would perceive anyone believing or suggesting that she could work as being inappropriate and she would likely display anger or resentment. Often with these types of cases when responsibilities are given them their physical symptoms worsen both with intensity and frequency. This would be expected in her case.

Next another three professionals—psychiatrist Dr. Allan Nelson, contractual psychologist Joseph Takash, Ed.D. ("Takash") and psychiatrist Dr. Kenneth Levitan—conducted examinations pursuant to the Appeals Councils' remand to an Administrative Law Judge ("ALJ") requesting that

---

5. This opinion has separated, as Dr. Sherman's final comment suggests, the evidence of neurologic impairment from the evidence of mental or psychological disorder, the former always being manifested by objective *physical* evidence and the latter not necessarily being ruled out by the lack of such evidence.

6. [Footnote by this Court] That and the other numbers refer to particular disorders according to the classification system set up in *Diagnostic and Statistical Manual of Mental Disorders* (American Psychiatric Association, 3d ed. rev. 1987) (*"Diagnostic Manual"*). Dr. Snyder's first reference, 307.80, is to "Somatoform Pain Disorder" (meaning the same as "psychogenic pain disorder," see *id.* Diagnostic Index at 565), which is characterized in part in the following manner (*id.* at 264–65):

> The essential feature of this disorder is preoccupation with pain in the absence of adequate

physical findings to account for the pain or its intensity.
> \*   \*   \*   \*   \*   \*
> Typically, the person becomes very incapacitated and has to quit working.

7. [Footnote by this Court] "Conversion Disorder," *id.* at 257 is explained in these terms:

> The essential feature of this disorder is an alteration or loss of physical functioning that suggests physical disorder, but that instead is apparently an expression of a psychological conflict or need.

8. [Footnote by this Court] This 300.40 reference is to "Dysthymia (or Depressive Neurosis)," *id.* at 230 (references specific to children have been removed from the quotation):

> The essential feature of this disorder is a chronic disturbance of mood involving depressed mood, for most of the day more days than not, for at least two years.

more psychological testing be done (R. 396). Those examinations will be dealt with in turn.

Dr. Nelson diagnosed Parks in these terms (R. 429):

1. The question is raised as to whether her physical symptoms, particularly her right sided weakness and pain may be psychogenic in origin. In my opinion it is possible that there may be a psychogenic component here, but there is probably an organic basis as well. Therefore, the diagnosis psychiatrically would be somatoform disorder [9] characterized by weakness and pain on the right side of her body.

2. Affective Disorder [10] characterized by moderate depression.

Furthermore, Dr. Nelson noted (*id.*):

As a consequence of [Parks'] physical symptoms which are quite genuine and not faked, she was unable to continue working and due to the increasing severity of symptoms, has been progressively unable to perform basic daily physical tasks.

Dr. Nelson later completed three separate medical assessment forms in November 1987, December 1987 and January 1988. In the first he wrote (R. 437):

Intellectually and emotionally she would be capable of performing simple occupational tasks. There would be mild impairment here because of her depression. Physical functioning is extremely limited because of the pain in her arm and shoulder.

His next two reports reflect the same notion that her depression would limit her moderately in mental functioning but that her physical problems would more significantly limit her overall functioning (R. 439–40, 441).

In the meantime Takash had evaluated Parks on September 19, 1987. He described her as (R. 431) "slightly depressed" and summarized his evaluation this way:

Aritha is a fifty-four year old woman who has a history of somatic complaints. She ambulates and talks very slowly in addition to having a significant hearing deficiency. Although tense and anxious and having feelings of personal inadequacy, she is reality oriented and discloses no serious emotional difficulties.

Finally Secretary referred Parks to Dr. Levitan, who on February 25, 1988 diagnosed her in these terms (R. 446):

1. Depression with possible somatic overlay

2. Multiple medical problems, including poor hearing, back and right shoulder problems, possible heart disease, hypertension, and migraine headaches[.]

Dr. Levitan characterized her physical problems as "genuine," and his impressions included (*id.*):

She ... is not very psychologically minded, so she would have more of a tendency to somatize and focus on her physical problems. She would benefit by outpatient psychotherapy and possible anti-de-

---

9. [Footnote by this Court] "Somatoform Disorder" refers more generally to a group of disorders that includes conversion and somatoform pain disorder (*Diagnostic Manual* at 255):

The essential features of this group of disorders are physical symptoms suggesting physical disorder (hence, Somatoform) for which there are no demonstrable organic findings or known physiologic mechanisms, and for which there is positive evidence, or a strong presumption, that the symptoms are linked to psychological factors or conflicts. Unlike in Factitious Disorder or Malingering, the symptom production in Somatoform Disorders is not intentional, i.e., the person does not experience the sense of controlling the production of the symptoms. Although the symptoms of Somatoform Disorders are "physical," the specific pathophysiologic processes involved are

not demonstrable or understandable by existing laboratory procedures and are conceptualized most clearly by means of psychological constructs. For that reason, these are classified as mental disorders.

10. [Footnote by this Court] "Affective Disorders" or "Mood Disorders" refer more generally to a group of disorders that includes dysthymia (*id.* at 213):

The essential feature of this group of disorders is a disturbance of mood, accompanied by a full or partial Manic or Depressive Syndrome, that is not due to any other physical or mental disorder. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

pressant medications, which I recommended to her.

Emotionally, she would be able to perform simple and routine tasks, although physically I doubt if she would be able to.

Shortly thereafter psychiatrist Dr. Yong Ha of the Southeast Mental Health Clinic began treating Parks. She sees a staff psychologist there once a month for medication and a therapist every two weeks for psychotherapy. Dr. Ha's primary diagnosis was "major depression, recurrent" and secondary diagnosis was "atypical mixed with other personality disorder" (R. 518). To the question, "Does the patient's psychiatric condition exacerbate any physical disorder, including any pain experienced because of a physical disorder?," Dr. Ha answered "yes" and also wrote in "degenerative arthritis (joint)" and "twisted spine." Dr. Ha also rated as "moderately severe" —meaning "an impairment which seriously affects ability to function"—the degree of limitation that Parks would experience in performing work, regardless of whether it required frequent or infrequent contact with others, and in performing simple tasks or complex tasks in a full-time work setting (R. 521–22). Dr. Ha commented "Patient's physical/mental status precludes her ability to function with consistency in a work setting" (*id.*).

### Statutory Framework

Before this opinion turns to the procedural history and the most recent findings of the ALJ in this case, it is useful to set out the statutory framework in which the administrative decisions have been made. That prefatory discussion is especially worthwhile here because of the multiple claims advanced by Parks.

Parks applied for disability benefits both as a wage earner and as a widow. Until recently a widow had to pass a more difficult test than a wage earner to prove disability: While a wage earner could qualify by demonstrating that he or she was unable to participate in "any substantial gainful work" (Section 423(d)(2)(A)), a widow had to show that she could not engage in "any gainful activity" (Section 423(d)(2)(B)).

*Marcus v. Sullivan*, 926 F.2d 604, 606 (7th Cir.1991) describes the handling of wage earner claims:

Wage earners are put through a five-step sequential inquiry. 20 CFR §§ 404.1520, 416.920 (1990). Step one eliminates those who are still in the workforce. 20 CFR §§ 404.1520(b), 416.920(b). Step two disqualifies claimants who do not have a "severe" impairment. §§ 404.-1520(c), 416.920(c). In the third step, the impairments of the claimant are compared to a listing ("Listing") of about 120 medical conditions which the Secretary concedes are severe enough to prevent a person from engaging in any gainful activity. §§ 404.1520(d), 416.920(d), 416.-925(a). If the wage earner's impairments meet or equal a listed impairment, the wage earner is conclusively determined to be disabled. §§ 404.1520(d), 416.920(d). If the wage earner fails to establish equivalence, however, the inquiry is not over. In step four, the Secretary considers whether the impairment prevents the claimant from performing work he has performed in the past. If the claimant can, he is disqualified. §§ 404.1520(e), 416.920(e). Finally, in step five the Secretary asks whether the claimant is able to perform other work in the national economy in view of his age, education and work experience. The claimant is entitled to benefits only if he cannot perform other work. §§ 404.-1520(f), 416.920(f).

By contrast, for widows step three had been the last step. That essentially meant that they could be denied disability benefits once it was shown that they did not meet one of the rigid Listings—even without having their individual residual functional capacity ("RFC") assessed first.

*Marcus*, 926 F.2d at 608 quotes Secretary's definition of RFC in SSR 83–10 as a:

medical assessment of what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s).

Or as the district court had put it in *Marcus*, RFC measures (926 F.2d at 608, quoting with approval the district court opinion at 696 F.Supp. 364, 368 (N.D.Ill.1988)):

> functional ability to stand, sit, follow instructions, lift or accomplish other of the tasks which may be necessary to engage in gainful activity.

■ Effective January 1, 1991 Congress has amended the Act so that "spouses" (that term includes widows, widowers and surviving divorced spouses) became subject to the same "substantial gainful activity" standard as wage earners and therefore now go through the same five-step approach in applying for disability benefits (Omnibus Budget Reconciliation Act of 1990, Pub.L. 101–508, § 5103, 104 Stat. 1388 (1990)). But even as to pre–1991–amendment claimants such as Parks, the class action decision in *Marcus*, 926 F.2d at 612 has invalidated, as contrary to both the letter and the spirit and intent of the Act, Secretary's denial of benefits to spouses without requiring an individual RFC assessment.

In response to the *Marcus* mandate, Parks' claims both as a wage earner and as a widow must be put through the five-step sequential inquiry. As it turns out, it is immaterial that the ALJ utilized only the first three steps (without an individual RFC assessment) in dealing with Parks' claim for disabled widow's benefits—for he did use the five-step approach and did assess her individual RFC when adjudicating her wage-earner claim for disability and SSI benefits.[11] This Court can look to the ALJ's analysis of her claim as a wage earner as if he had applied it to her entire claim, because the analysis would have been the same in either case.

### Administrative Proceedings and Findings

After an administrative hearing on Parks' claim, ALJ Arthur Lanker issued an October 20, 1986 decision denying her bene-

fits. He found that the medical evidence did not meet any of the requirements of the Listing, that her testimony as to the restrictions in her daily activities due to her physical impairments was not credible, that she had the RFC to perform work-related activities except for work involving heavy activities, that her past relevant work as a custodian in a bakery was consistent with such a limitation and that she was not prevented her from performing her past relevant work and was therefore not "disabled" as defined by the Act (R. 379–80).

Parks requested review. On June 11, 1987 the Appeals Council vacated the decision and remanded to Secretary, ordering the ALJ to obtain a consultative psychiatric examination with psychological testing and a medical assessment describing Parks' ability to reason or make occupational, personal or social adjustments (R. 396). On remand ALJ Edward Bobrick issued a July 22, 1988 decision in which he found that the new medical evidence, including the findings of Drs. Nelson and Levitan as well as psychologist Takash, only reinforced the appropriateness of ALJ Lanker's decision. ALJ Bobrick essentially adopted the Lanker conclusions (R. 463–68).

Once again Parks requested review. On March 23, 1989 the Appeals Council again vacated the decision and remanded the case to Secretary, in part because (R. 495):

> While the Administrative Law Judge referred to and adopted the previous Administrative Law Judge's conclusions as to the claimant's mental disorder(s) in the decision, the Psychiatric Review Technique form (PRTF) is not consonant with the findings of record. Although, "No Medically Determinable Impairment" was checked, from its review of the record, the Appeals Council is persuaded that the claimant does have a mental impairment.

Hence the Appeals Council ordered the ALJ to complete a PRTF in reaching his new decision. In addition, Parks had not

---

**11.** Indeed, the district court in *Marcus* excluded from the plaintiff class individuals like Parks whose concurrent applications for disability or SSI benefits were denied based on their ability to perform past relevant work or other work in the national economy (*Marcus v. Bowen*, 1989 WL 39709, at 4–5, 1989 U.S.Dist. LEXIS 4129, at 12–14 (N.D.Ill. April 17, 1989)).

been given a right to review and comment and have an oral hearing on the additional medical evidence, so that the case was remanded for such an opportunity as well (R. 496).

ALJ Bobrick conducted an additional hearing on June 5, 1989 and issued his final decision on September 14, 1989. His findings were (R. 20):

> The medical evidence establishes that the claimant has severe hypertension, degenerative joint disease, chronic obstructive pulmonary disease, a dysthymic disorder and somatoform disorder, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.[12]

> The claimant's testimony was not credible and out of proportion to the record as a whole.

> The claimant has the residual functional capacity to perform work-related activities except for work involving lifting over 50 pounds, and performing complexed [sic] skilled work activity within a stressful environment (20 CFR 404.1545 and 416.945).

Moreover, the ALJ found that Parks was able to perform her past relevant work as a custodian in a bakery and that she was not under a "disability" as defined in the Act at any time through the date of the decision (*id.*).

On July 3, 1990 the Appeals Council denied review of that decision, which thus became Secretary's final decision. It is that final decision as to which Parks seeks review in this Court.

### Standard of Review

■ Under Section 405(g) this Court has the power to affirm, modify or reverse, with or without remand for a rehearing, Secretary's decision to grant or deny a claim for disability benefits. Section 405(g) further provides:

The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive[.]

"Substantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (*Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) "tak[ing] into account whatever in the record fairly detracts from its weight") (*Bauzo v. Bowen,* 803 F.2d 917, 923 (7th Cir.1986) (citations omitted)). *Garfield v. Schweiker,* 732 F.2d 605, 610 (7th Cir.1984) (citations omitted) warns:

> While a reviewing court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Secretary, it must be more than an uncritical rubberstamp.

This Court therefore approaches its reviewing role with deference, but nevertheless mindful of its own duty to review the entire record.

### ALJ's Assessment of Medical Evidence

■ It is within an ALJ's authority to assess medical evidence and, if it is nonuniform, to give greater weight to the evidence that he or she finds more credible (*Strunk v. Heckler,* 732 F.2d 1357, 1364 (7th Cir.1984) (citations omitted)):

> [I]t is the Secretary, not the courts, who must resolve conflicts in the medical evidence.

This Court does not disturb such legitimate judgment calls.

■ However, an ALJ's findings cannot be said to be supported by substantial evidence when important medical evidence is virtually ignored without explanation (see *Garfield,* 732 F.2d at 609, finding an ALJ's conclusion not supported by substantial evidence when he ignored the two later reports of a doctor, relying only upon the doctor's first report). As stated in *Garfield,* 732 F.2d at 609, 610:

> listed functional limitations (known as the "B" criteria), two of which are needed to make a finding that an affective disorder exists.

---

**12.** [Footnote by this Court] ALJ Bobrick did not find Listing 12.07 (Somatoform Disorders). Although he found the presence of Listing 12.04 (Affective Disorders), he did not find any of the

[T]he ALJ must articulate at some minimal level his analysis of the evidence in cases where considerable evidence is presented to counter the agency's position.

\*     \*     \*     \*     \*     \*

We hold that all medical evidence that is credible, supported by clinical findings, and relevant to the question at hand should be considered and discussed by the ALJ. The decision should contain and should be based upon a fair and impartial presentation of the medical evidence submitted by the claimant or obtained from other sources.

To be sure, the ALJ does not need to meet the impossible burden of mentioning *every* piece of evidence (*Steward v. Bowen,* 858 F.2d 1295, 1299 (7th Cir.1988)), but he or she has *at the least* the obligation to provide a justification for rejecting considerable evidence that is both counter to Secretary's position (*Zblewski v. Schweiker,* 732 F.2d 75, 79 (7th Cir.1984)) and is essentially uncontradicted (*Walker v. Bowen,* 834 F.2d 635, 643 (7th Cir.1987)).

Here ALJ Bobrick's error lies in his having failed to grasp the medical significance of somatoform disorders and therefore in failing to address the doctors' findings in that respect. As explained in the strikingly similar case of *Easter v. Bowen,* 867 F.2d 1128, 1130 (8th Cir.1989):

Although the ALJ's opinion discusses many of [claimant's] complaints, and cites her somatoform disorder, it does not adequately consider the effects of that mental condition. The ALJ finds that "[w]hile the claimant has allegations of pain in multiple areas, those allegations are inconsistent with the clinical and nonmedical evidence of record, except as related to her somatoform disorder." Tr. 203. In concluding that

[claimant] is not disabled, the ALJ fails to appreciate that the somatoform disorder itself is disabling in [claimant's] case. Any shortcomings in the objective medical data that support her alleged physical ailments are irrelevant since her primary disorder, as clinically diagnosed, causes her to exaggerate her physical problems in her mind beyond what the medical data indicate.

Here three psychiatrists and two psychologists separately evaluated Parks' mental health. It was all three psychiatrists' and one psychologist's unanimous and overwhelming evaluation, without contradiction, that Parks is a woman who has a mental condition that causes her to feel real physical pain.[13] As already defined, somatoform disorders involve (*Diagnostic Manual* at 255):

physical symptoms suggesting physical disorder ... for which there are no demonstrable organic findings or know physiologic mechanisms, and for which there is positive evidence, or a strong presumption, that the symptoms are linked to psychological factors or conflicts.

Thus psychologist Snyder found two forms of somatoform disorder—psychogenic pain disorder and conversion disorder—to be present. Dr. Nelson also diagnosed Parks as having a somatoform disorder with physical symptoms that were "quite genuine and not faked" and that would cause her great difficulty in performing physically. Next Dr. Levitan diagnosed Parks as having "depression with possible somatic overlay," noting that her physical problems were "genuine" and that she would be *physically* unable to perform simple tasks even though she may *emotionally* be up to the tasks. Finally, Dr. Ha and his staff, although not naming somatoform disorder as part of the diagno-

---

**13.** Psychologist Takash's diagnosis was more along the lines of finding that Parks suffered from an affective disorder in the form of depression, also specifically found by some of the doctors—a diagnosis that does not necessarily lead to physical limitations. But Takash did not make express findings either way as to Parks' physical limitations, so that his diagnosis cannot be said to have contradicted those of the doctors

sis,[14] made findings consistent with that disorder in that the limitations on her physical capabilities were moderately severe and that her "physical/mental status" would make it very difficult for her to perform in a work setting.[15]

ALJ Bobrick summarizes the findings of the other doctors in a limited and selective fashion that quite ignores the link that a somatoform disorder diagnosis[16] makes between the mental and the physical. Instead he treats the objective medical evidence of physical impairments as though it were the last word (more accurately, the *only* word) on Parks' physical abilities, viewing the psychiatric and psychological evidence as relating only to her ability to perform mentally and emotionally in a work setting—which the doctors conceded she could do—and as having nothing to do with her ability to perform physically. For instance, ALJ Bobrick does not at all discuss Dr. Nelson's express findings about the impact of Parks' somatoform disorder on her physical capabilities. What he rather does is to discuss and find significant only that Dr. Nelson did not find evidence of formal thought disorder or hallucinations, delusions, paranoid thoughts or loose associations and that she could handle simple tasks emotionally and intellectually (R. 16).[17]

In addition, the ALJ's opinion ignores the doctors' opinions—fundamental to their diagnosis—that Parks' physical symptoms were genuine. But an ALJ must give sufficient weight to the subjective as well as the objective aspects of a doctor's opinion (*Rodriguez v. Bowen*, 876 F.2d 759, 762 (9th Cir.1989)). ALJ Bobrick takes his own reading of Parks' subjective complaints of pain and decides that they are not credible in view of the fact that

or to be at all inconsistent with a diagnosis of somatoform disorder.

14. This is a good place to emphasize that the diagnosing of mental disorders is not as exact a science as diagnosing physical ailments—indeed, it is contrary to the science itself to force classifications on people with mental disorders (*Diagnostic Manual* at xxii):

There is no assumption that each mental disorder is a discrete entity with sharp boundaries (discontinuity) between it and other mental disorders, or between it and no mental disorder.

It is therefore unsurprising that not all doctors would name the same disorder in expressing their evaluations. What is more significant is to see whether (as here) they are describing the same or a consistent syndrome, irrespective of the label that may attach to it.

15. ALJ Bobrick found, and Secretary argues here, that Dr. Ha's diagnosis is not supported by objective medical findings. But as discussed in this opinion:

1. Dr. Ha's observance of Parks over a period of time and his subjective professional impressions are often all a doctor will have to make a diagnosis of a medical disorder.

2. Even more importantly, that position misses the entire point that the very nature of the somatoform disorder is that it has real world effects *without* the objective medical findings that attach to physically-generated pain.

16. Secretary's arguments before this Court (Mem. 4–5, 10) have the flavor of suggesting that no mental impairment exists in Parks' case—an untenable position in light of the Appeals Council's March 23, 1989 determination (as part of its second and last remand to ALJ Bobrick, R. 495):

[F]rom its review of the record, the Appeals Council is persuaded that the claimant does have a mental impairment.

ALJ Bobrick could no more ignore that determination than this Court could ignore law of the case that had been established on an earlier appeal to our Court of Appeals—and to his credit he did not, for his error was not in failing to acknowledge the existence of Parks' mental impairment but rather in failing to perceive how it actually affected her ability to work (just as would have been true of *physical* limitations caused by pain having support in *objective* medical evidence). Nor can Secretary now recast the Appeals Council's 1989 determination, which was left unimpaired by ALJ Bobrick's later decision, just because it seems expedient to do so.

17. As one additional example of ALJ Bobrick's misunderstanding of the disorder, he classified Dr. Sherman's findings as part of the psychological evidence and as proof that there was no objective medical evidence of a psychological disorder. But as this opinion has already mentioned, a neurologic examination is a physical examination and *not* a psychiatric or psychological examination. Hence when ALJ Bobrick summarizes that Dr. Sherman "believed this was more a functional disorder than anything else" (R. 17), he fails to recognize that a somatoform disorder *is* such a functional disorder and has serious implications borne out by the psychiatric and psychological evidence.

they are out of proportion to the objective medical evidence. Although an ALJ may indeed make such credibility determinations of a lay person's testimony, and although this Court will not overturn such a finding unless it was "patently wrong" (*Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir.1989)), the ALJ cannot ignore the doctors' separate, professional determinations of the credibility of her complaints of pain that are the bases of their findings.

Moreover, ALJ Bobrick's credibility finding again fundamentally misunderstands the nature of a somatoform disorder diagnosis. In that situation the patient's complaints of pain, and indeed experience of real pain, will *not* be borne out by objective medical evidence. Any decision to disbelieve Parks' complaints would lead to a professional diagnosis that she was malingering, or feigning the pain.[18] That was not in fact a diagnosis made here. Once again, as discussed in *Easter*, 867 F.2d at 1130:

> The ALJ dismisses [the doctor's] assessment of his long-term patient's disabling condition because it is based upon [claimant's] subjective impressions of her health, unsupported by objective medical evidence that could corroborate her complaints. This misses the point of her serious mental problem. There is no suggestion in the record that [claimant] is malingering or pretending to experience her many ailments. She has consistently sought medical treatment from her family physician and a number of

specialists, and takes a variety of prescription medications [for hypertension, headaches, arthritis and muscle spasms]. Just so here, Parks consistently sought treatment and took medication for her ailments—indeed, she refused to believe there was a psychiatric or psychological component to her pain.

In sum, this Court holds that ALJ Bobrick failed to address the overwhelming psychiatric and psychological findings that Parks is experiencing real pain that would render her unable to perform physically in a work environment. That failure has meant that it is quite irrelevant whether or not substantial evidence supports the ALJ's finding that her impairment did not meet the Listing requirements for somatoform disorder[19] (particularly with respect to the "B" criteria), because his finding that she had the RFC to perform her past relevant work was squarely unsupported by substantial evidence. Although ALJ Bobrick mentioned the somatoform disorder, his association of psychiatric and psychological evidence only with Parks' ability to perform mentally and emotionally reflects a lack of understanding and appreciation of the diagnoses of that mental disorder.

### *Reversal Rather Than Remand*

Section 405(g) confers judicial authority to affirm, modify or reverse the Secretary's decision "with or without remanding the cause for a rehearing." *Rodriguez*, 876 F.2d at 763 (citations omitted)

18. See n. 9, which distinguishes malingering from the reality of somatoform disorders.

19. To find the presence of a somatoform disorder under the Listing requirements of 12.07, the ALJ must find first (these are the "A" criteria) (R. 386):

> Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms, as evidenced by at least one of the following:
> 1. A history of multiple physical symptoms of several years duration beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly
> 2. Persistent nonorganic disturbance of one of the following:
> a. Vision, or
> b. Speech, or

> c. Hearing, or
> d. Use of a limb, or
> e. Movement and its control (e.g., coordination disturbances, psychogenic seizures, akinesia, dyskinesia), or
> f. Sensation (e.g., diminished or heightened)
> 3. Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury
> 4. Other

Then the ALJ would turn to the functional limitations, or "B" criteria, and would have to find three of the following significantly restricted: activities of daily living; social functioning; concentration, persistence and pace; and deterioration or decompensation in work or work-like settings (R. 388).

summarizes the predicates for reversal rather than remand:

> [W]e generally award benefits when no useful purpose would be served by further administrative proceedings, or when the record has been fully developed and there is not sufficient evidence to support the ALJ's conclusion. Remand is appropriate "where additional administrative proceedings could remedy defects"; but where remand would only delay the receipt of benefits, judgment for the claimant is appropriate.

This Court has reviewed the entire record, including Parks' testimony and the uncontradicted opinions of psychologist Snyder and Drs. Nelson, Levitan and Ha— all of which find severe physical limitations due to a mental disorder. Clearly there is not substantial evidence to support ALJ Bobrick's findings. There is no dispute concerning the existence of a somatoform disorder and its disabling effect. This case is no different from one in which all of the uncontroverted medical evidence showed those selfsame limitations supported by objective medical findings. Were that the situation, no ALJ finding of the absence of disability could survive scrutiny. In that event the failure of the claimant's situation to meet a particular Listing would be irrelevant, and the same is true here.

Enough is enough—what end would be served by yet another remand when the record here is already fully developed? It would be pointless to remand this case for further proceedings simply to have a new ALJ[20] come to the same and only conclusion that can be reached here: Parks cannot engage in any gainful activity and does not have the RFC to perform in a work setting.

It would simply be unfair to delay Parks' receipt of benefits when she has spent well over six years litigating her claim. As stated in *Lindner v. Sullivan,* 902 F.2d 1263, 1267 (7th Cir.1990), where the claimant had appeared three times before two ALJs, had her case reviewed each time by the Appeals Council and appealed twice to the district court:

> We recognize the merit of bringing this interminable litigation to an end as soon as resolution of the major issues will permit.

Accord, *Bell v. Bowen,* 658 F.Supp. 533, 539 (N.D.Ill.1987), where the district court reversed rather than remanding because two remands to the Appeals Council and two opportunities for Secretary to develop the record had "already consumed a substantial amount of time." Accordingly this Court reverses Secretary's decision.

### Conclusion

There is no genuine issue of material fact in the record as to Parks' claims for disability and SSI benefits and the existence of a physically disabling somatoform disorder. ALJ Bobrick's findings are therefore not supported by substantial evidence. Rather the evidence compels the conclusion that Parks is disabled. This case is reversed and remanded for a far more limited purpose: for Secretary to award benefits to Parks in the appropriate amount.

---

**20.** ALJ Bobrick is now a Magistrate Judge in this District Court, performing distinguished service in that capacity. His decision as to Parks reflects a wholly atypical error on his part—as Horace said in *Ars Poetica,* line 402:
Homer himself hath been observ'd to nod.