Peggy WACHTER, Plaintiff,

v.

Donna E. SHALALA, Secretary of Health and Human Services, Defendant.

No. 92–CV–554.

United States District Court,
W.D. New York.

June 30, 1994.

Donald H. Michalak, Fredonia, NY, for plaintiff.

Patrick H. NeMoyer, U.S. Atty. (Donald P. Simet, of counsel), Buffalo, NY, for defendant.

CURTIN, District Judge.

Plaintiff Peggy Wachter appeals from a decision of the Secretary of Health and Human Services which granted her widow's disability insurance benefits under the Social Security Act ("the Act"), 42 U.S.C. § 301 *et seq.*, after January 1, 1991, but which denied benefits from March 25, 1987, until January 1, 1991.

At the time of her application for benefits on March 25, 1987, Ms. Wachter was 54 years of age. She had been married to Paul Wachter, a fully insured wage earner under the Act who died on July 8, 1985. She has had serious heart and other medical problems since childhood. She is illiterate and has no work experience.

Ms. Wachter's claim was initially denied in its entirety. Administrative Law Judge ("ALJ") Margaret J. Quinn affirmed the denial in a decision issued on August 8, 1989. On June 18, 1990, the Appeals Council remanded for reconsideration in the light of *Kier v. Sullivan*, 888 F.2d 244 (2d Cir.1989). On May 6, 1991, the ALJ issued a decision finding that Ms. Wachter had not been disabled within the meaning of the Act prior to August 1, 1990, but that she had been under a disability under the Act as amended by Pub.L. 101–508 (1990), since August 1, 1990, entitling her to benefits commencing January 1, 1991. The Appeals Council affirmed.

Both parties have moved for judgment on the pleadings. Ms. Wachter argues that *Kier* requires that she be awarded benefits back to the date of her original application, March 25, 1987, or, in the alternative, from April 28, 1989, after which she claims that there is no evidence in the record to support a determination that she was able to perform any gainful activity. The Secretary maintains that, to the contrary, her decision properly applied *Kier*, and was supported by substantial evidence.

## BACKGROUND

### A. *Medical Evidence*

There is no real dispute over the medical evidence in this case. Peggy Wachter suffers from severe congenital heart disease (corrected by surgery in 1948 and 1980), medication-controlled essential hypertension, pulmonary hypertension limiting exercise tolerance, subjective complaints of arm and hand pain treated with anti-inflammatory medications beginning in June 1990, and subjective complaints of anxiety noted by her treating physician for which she has received no treatment. A.R. 30, 33.[1] The ALJ found Ms. Wachter's subjective complaints to be credible, and supported by the medical record. A.R. 33.

Ms. Wachter's physician for many years has been Dr. Charles Furr, a cardiologist. In 1980, Dr. Furr performed surgery on Ms. Wachter, for correction of tetralogy of Fallot. In a report apparently written some time in 1987, he stated that she was doing well clinically, although she did have dyspnea, fatigue, cyanosis, hypertension, occasional chest pain and rare palpitations. A.R. 108. There was no congestive heart failure or arrhythmia. *Id.* Dr. Furr treated her with medication. A.R. 109.

Dr. Devendra Gill treated Ms. Wachter occasionally between October 1, 1985 and January 8, 1988. A.R. 105–106, 124–125. He noted a history of hypertension, but that Ms. Wachter made no specific complaints, although she was "feeling weak." A.R. 105. He prescribed medication. A.R. 106, 124.

Dr. Edward Davis treated Ms. Wachter between August 10, 1988, and October 12, 1988. A.R. 126–127. In his report of October 27, 1988, he noted blood pressure in the range 150/96 to 160/100, and shortness of breath and ankle edema in hot weather, but no chest pain or palpitations.

On February 1, 1989, Dr. Furr updated his report to the ALJ. A.R. 129. He said that when he had seen Ms. Wachter on March 23, 1987, she had complained of mild shortness of breath in the shower but at no other time. She had told him that she could do her household chores, climb stairs, and lie flat in bed without shortness of breath. She had denied palpitations or chest pain. There was no evidence of congestive heart failure. She was continued on her regular medications. When Dr. Furr saw her in June 1988, she did not complain of cardiac symptoms other than mild shortness of breath and an occasional palpitation. She had occasional swelling of her ankles, and was complaining of stiffness and discomfort in her hands. She was con-

1. Citations to the administrative record will be abbreviated as "A.R." followed by the appropriate page number.

tinued on medication for control of high blood pressure. Dr. Furr stated that she was doing fairly well, but that she might be disabled for a job requiring more than moderate physical activity. He went on to say that "she could probably perform sedentary or very light physical exertion without too much trouble." He noted that she might have difficulty because of chronic anxiety, but stated that as a cardiologist, he did not consider himself qualified to render an opinion in that regard.

Dr. Furr saw Ms. Wachter again on April 28, 1989. A.R. 130–131. At that time, she told him that her exercise tolerance had deteriorated since December. She did not have chest pain or palpitations. However, climbing more than one flight of stairs, attempting to do household chores, and walking more than a short distance caused her to be dyspneic and fatigued. He found that she had significant limitation in exercise tolerance because of shortness of breath and fatigue, which were related to her underlying heart disease. He directed that an exercise test be given on that day, and that she be continued on her current medication. The exercise test confirmed "very poor exercise tolerance" in a "very low level stress test." A.R. 155–59. The testing physician, Dr. Underhill, noted that Ms. Wachter was "obviously in considerable distress" during the test, "becoming short of breath and reporting severe lightheadedness." A.R. 155. He stated that she "looked quite pale," even though her heart rate had only risen slightly. He also noted that the EKG was "markedly abnormal at rest." *Id.*

When Dr. Furr saw Ms. Wachter on October 3, 1989, she had less shortness of breath than on her last visit. A.R. 175. Dr. Furr commented that she was "able to do approximately what she wants." *Id.* She had intermittent ankle edema. Palpitations were minimal. She denied chest pains. She had a Grade 2 diastolic murmur, and questionable gallop. Medication was continued.

Dr. Furr again examined Ms. Wachter on June 12, 1990. A.R. 175. At that time, she reported more shortness of breath and more edema, chest pain, and arthritic pains in her arms and shoulders. In addition to referring to Ms. Wachter's symptoms of heart disease, Dr. Furr diagnosed degenerative arthritis, for which he prescribed Ansaid, an anti-inflammatory. A.R. 30, 175.

Dr. Davis reexamined Ms. Wachter on December 12, 1990. A.R. 179–184. He diagnosed tetralogy of Fallot, high blood pressure and depression. A.R. 179, 182. In his view, Ms. Wachter could lift ten pounds and walk and stand occasionally. A.R. 183. She could sit but could not climb, balance, or crawl. She could occasionally stoop, crouch, and kneel, but her ability to push and pull was affected. A.R. 183–84.

## B. *Report of Medical Expert*

The ALJ secured answers to interrogatories from Dr. Robert Kohn, a cardiologist. A.R. 161–62. Dr. Kohn's report is dated July 18, 1989, and was based on the administrative record through April 1989. A.R. 30–31, 162.

Dr. Kohn opined that Ms. Wachter did not have an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 4.00, as there was no evidence of congestive heart failure or coronary artery disease. He noted that her record showed ankle swelling in hot weather, but indicated good left ventricular function. A.R. 161. He stated that the stress test administered in April 1989 was not reliable, because the resting electrocardiogram showed a bifasicular block as a result of previous surgery involving the ventricular septum. *Id.* He noted that pulmonary hypertension was present as a result of heart disease, which could limit exercise ability, but he said that there was no objective evidence of either left or right heart failure in the medical record. *Id.* He expressed the view that Ms. Wachter could not do strenuous work due to her congenital heart disease and resulting surgery, but she was able to do sedentary or light work. A.R. 162. This view was based on his impression from the record that "she apparently does much around the house such as her laundry, bed changing, and similar activity." *Id.* He went on to say that Ms. Wachter "probably does have right ventricular hypertrophy and right ventricular enlargement," but "[s]ince she does not have the associated congestive

heart failure as required by 4.02, this would not be the equivalent of the listings." *Id.*

### C. *Testimony of Ms. Wachter and her Housekeeper*

At her hearing before the ALJ on April 6, 1989, Ms. Wachter testified that before her surgery in 1948, and again before surgery in 1980, the skin on her face and hands used to be blue. A.R. 194. That condition had returned in the past six months, with the blue color being evident two or three times a week. *Id.* It was particularly evident when the weather was cold or humid. A.R. 203. The ALJ noted that Ms. Wachter's hands had a grayish cast to them on the day of the hearing. A.R. 213. Ms. Wachter testified that she suffered from numbness in the right arm, which would occur once or twice a day, for periods of about 15–20 minutes. A.R. 194–195. She also suffered from a crushing sensation in her chest, brought on by depression or by exertion. A.R. 196–197. Her legs and feet would swell "a lot" every day. A.R. 199–200, 212. She stated that she was supposed to sit with her feet up during the day, but that instead she would lie down about four or five times a day, for as much as two or three hours at a time, because she would get so tired that she couldn't keep going. A.R. 200–201. She suffered from shortness of breath when she walked up steps, when she took a shower, and when she went shopping or walking. A.R. 201–202. She testified that she had been suffering from depression. A.R. 206–208. She had arthritis in her right arm and right leg, for which she was taking Tylenol. A.R. 208–209.

Ms. Wachter testified that she could wash, dress and bathe and shower independently, and could cook for herself and wash dishes. A.R. 209–210. She could not, however, do any sweeping or vacuuming, or move furniture, or do laundry (which would involve climbing two flights of stairs). A.R. 197, 210. When she went shopping, she had to rely on a friend to reach up and take things off the shelves for her. A.R. 210. She had previously done a lot of crocheting, but had to stop because of her arthritis. *Id.* She could

lift, but not carry, about 20 pounds, and was unable to push, pull, stoop, squat, reach or stretch. A.R. 211–212. She could stand for "[p]robably about a half an hour to an hour," and would generally lie down rather than sit because she felt that "when I'm laying down my feet are up with me, too." A.R. 211.

Also at the April 6, 1989, hearing, Ms. Wachter's housekeeper, Harriet Harvey, testified that she performed many household duties for Ms. Wachter, including doing her laundry, changing her bed, moving the furniture and dusting and vacuuming, and scrubbing the bathroom. A.R. 214–215.[2] Ms. Wachter was able to clean her collection of bells, but even that would make her tired, and would take a long time. A.R. 215. Ms. Harvey indicated that over the year that she had been working for Ms. Wachter, it had become harder for Ms. Wachter to perform her household chores. *Id.*

At a supplemental hearing on January 17, 1991, Ms. Wachter testified that the arthritis in her right arm was "getting bad," and that her heart condition was "about the same." A.R. 64. She said that she could no longer carry her groceries, but that nothing else in her condition had changed. A.R. 68.

### DISCUSSION

### 1. *Statutory Standard for Entitlement to Benefits*

To qualify for widow's benefits under the Social Security Act before January 1, 1991, an applicant's disability had to be sufficiently severe to preclude the applicant from engaging in *any* gainful activity. 42 U.S.C. § 423(d)(2)(B) (1982 & Supp. V. 1987); *see Kier v. Sullivan,* 888 F.2d at 246 (2d Cir. 1989). The implementing regulations stated that physical and mental impairments, but not age, education and work experience, would be considered in making widows' disability determinations. 20 C.F.R. §§ 404.-1577.

On October 23, 1989, the Second Circuit held in *Kier* that the Secretary must also consider an applicant's "residual functional

---

**2.** Although described in the record as a "housekeeper," Ms. Harvey would come to clean for Ms. Wachter only once a week, for about three hours. A.R. 214.

capacity." *Kier v. Sullivan,* 888 F.2d at 246–247. More specifically, the court held that residual functional capacity must be considered in determining whether a widow's impairments are medically equivalent to a condition contained in the Secretary's Listing of Impairments, 40 C.F.R. Part 404, Subpart P, Appendix 1, deemed sufficiently severe to preclude gainful activity. *Id.*

The term "residual functional capacity" is defined in 20 C.F.R. § 404.1545(a) as "what [a claimant] can do despite [her] limitations." It is a medical assessment, although it properly includes a description (even a claimant's own) of limitations that go beyond the symptoms that may be important in the diagnosis and treatment of the claimant's medical condition, when such a description has been placed in the record. *Id.* It is a measure of a claimant's capacity to work, and may include an assessment of physical abilities, mental impairments and other impairments. 20 C.F.R. § 404.1545(b), (c), (d).

In 1990, Congress amended the Social Security Act to provide that as of January 1, 1991, the definition of disability for the purpose of determining spouses' (*i.e.* widows', widowers', and surviving divorced spouses') benefits would conform with that applicable to wage-earners' disability claims under Title II of the Act. Pub.L. 101–508, § 5103. *See Marcus v. Sullivan,* 926 F.2d 604, 612 (7th Cir.1991); *Parks v. Sullivan,* 766 F.Supp. 627, 633 (N.D.Ill.1991). Specifically, the Act now provides that an applicant's disability must be sufficiently severe to preclude *substantial,* rather than *any,* gainful activity. 42 U.S.C. § 423(d)(2)(A). In determining whether or not a widow is disabled for the purposes of the Act, the Secretary now considers not only mental and physical impairments and residual functional capacity, as required under the pre–1991 language of the Act and *Kier,* but also age, education, and work experience, and work available in the national economy. Disability determinations follow the sequential evaluation process outlined in the Social Security Administration regulations at 20 C.F.R. § 404.1520. *Marcus v. Sullivan,* 926 F.2d at 612; *Parks v. Sullivan,* 766 F.Supp. at 633.

## 2. *Scope of Judicial Review*

 This court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Secretary's factual determinations are conclusive if her decision is supported by substantial evidence on the record as a whole. *Havas v. Bowen,* 804 F.2d 783, 785 (2d Cir.1986); *Gold v. Secretary of Health, Education and Welfare,* 463 F.2d 38, 41 (2d Cir.1972). "Substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Havas v. Bowen,* 804 F.2d at 785 (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). To determine whether the Secretary's findings are supported by substantial evidence, the court must consider "the entire record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988) (citing *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir.1983). Where evidence has not been properly evaluated because of an erroneous view of the law, the Secretary's determination should not be upheld. *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979).

 Meaningful review of a disability determination requires that the Secretary articulate reasons for accepting or rejecting entire lines of evidence. *See Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir.1994). The Secretary may not select and discuss only that evidence that favors her ultimate conclusion, and her decision must be based upon consideration of all of the relevant evidence. *Id.* Where items of pertinent weight have been missed, her decision should not be upheld. *See New York ex rel. Bodnar v. Secretary of Health and Human Services,* 903 F.2d 122, 126–127 (2d Cir.1990).

### 3. *The ALJ's May 6, 1991, Decision*

In her May 6, 1991, decision, the ALJ found that the medical evidence failed to establish that Ms. Wachter had an impairment or combination of impairments listed in, or medically equivalent to one listed in, 20 C.F.R. Part 404, Subpart P, Appendix 1. A.R. 33. She held that as a result, she could not find Ms. Wachter disabled within the meaning of the Act, the regulations and *Kier* prior to August 1, 1990. *Id.*

The ALJ then considered whether Ms. Wachter would be entitled to receive benefits commencing in January 1, 1991, under the 1990 Amendment to the Act. She made a determination of Ms. Wachter's disability under the new standard as of August 1, 1990, so that the required 5–month waiting period could be served prior to January 1, 1991. A.R. 29. She found that Ms. Wachter retained the residual functional capacity to perform the full range of sedentary work under 20 C.F.R. § 404.1567 as of August 1, 1990. A.R. 33. However, she went on to find that despite this, when Ms. Wachter's age, education, and work experience were also considered, as required under the 1990 Amendment to the Act, Ms. Wachter should be considered disabled commencing August 1, 1990, under 20 C.F.R. § 404.1569 and Rule 201.01, 20 C.F.R. Part 404, Subpart P, Appendix 2, Table No. 1. A.R. 33–34. She therefore determined that Ms. Wachter was entitled to benefits commencing January 1, 1991. A.R. 34.

### 4. *Ms. Wachter's Appeal*

The thrust of Ms. Wachter's appeal is that the ALJ's determination that she was not disabled under the pre–1991 language of the Act is not supported by substantial evidence.

■ A fair reading of the record confirms that there is sufficient evidence to support a finding that Ms. Wachter was capable of performing gainful activity until October 1988. In his letter of February 1, 1989, to the ALJ, Ms. Wachter's treating physician, Dr. Furr, expressed the opinion that when he saw her in June 1988, Ms. Wachter "could probably perform sedentary or very light physical exertion without too much trouble."

A.R. 129. There is no evidence in the record to contradict Dr. Furr's opinion. Further, there is nothing in the report of Dr. Davis, who treated Ms. Wachter between August 10, 1988, and October 12, 1988, to suggest that her condition deteriorated between June and October 1988, or that she could not have engaged in some gainful activity at that time. A.R. 126–127.

■ The record for the period from October 1988 to December 1990 provides a very different picture. Ms. Wachter's condition evidently took a significant turn for the worse between October 1988 and April 1989. On April 28, 1989, Ms. Wachter told Dr. Furr that her exercise tolerance had deteriorated since December, 1989. Consistent with this, the physical difficulties and limitations she described at the hearing before the ALJ on April 6, 1989, were far more severe than those described by Dr. Furr in his February 1, 1989, report of her condition in the period from March 1987 to June 1988. Similarly, while the medical reports for the period from March 1987 through October 1988 indicate only mild shortness of breath and fatigue at that time, Dr. Furr found on April 28, 1989, that Ms. Wachter's exercise tolerance was significantly limited because of shortness of breath and fatigue. This finding was confirmed by very poor exercise tolerance in a very low level stress test, in which Ms. Wachter was reportedly in considerable distress.

In her May 6, 1991, decision, the ALJ made note of Dr. Furr's report that Ms. Wachter's exercise tolerance had "subjectively decreased" between December 1988 and April 1989, and that by April 1989, her heart disease caused "significant limitation in exercise tolerance." A.R. 31. The ALJ went on to find that there had been no significant change in Ms. Wachter's clinical condition between April 1989 and the time of Dr. Furr's examination in June 1990. *Id.* There is no reason to disagree with these findings. However, the ALJ then proceeded to accept the July 1989 opinion of the medical expert, Dr. Kohn, as "valid for the entire period to be adjudicated under the standards in *Kier.*" *Id.* She observed that Dr. Kohn had indicated that Ms. Wachter's condition did not meet

or equal in severity any listed impairment, and she noted that there was no evidence from any treating source to contradict Dr. Kohn's conclusion. *Id.* On this basis, she found that Ms. Wachter could not be considered disabled under the meaning of the Act, the regulations and *Kier* at any time prior to August 1, 1990. A.R. 31–34. As discussed below, this conclusion cannot be upheld under *Kier*, because there is no indication that Dr. Kohn considered residual functional capacity in making his determination, or that the ALJ gave any consideration to the April 6, 1989, hearing testimony given by Ms. Wachter and her housekeeper, Ms. Harvey, concerning the limitations on Ms. Wachter's ability to function.

At the April 6, 1989, hearing, Ms. Wachter testified that she would get so tired that she would have to lie down four or five times per day, for as much as two or three hours at a time; that her legs and feet would swell a great deal every day; that she could not stand for more than half an hour to an hour; that she would lie down, rather than sit, so as to keep her feet up; and that she was greatly limited in the extent to which she could walk, perform a variety of physical activities, and do her household chores. Her statements strongly suggest that she did not possess the residual functional capacity to perform any gainful activity in April 1989. This view is supported by the testimony of Ms. Harvey.

Following the April 6, 1989, hearing, Dr. Kohn was asked to review Ms. Wachter's file and to provide the ALJ with a determination of whether Ms. Wachter's condition met or equalled any listed medical impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 4.00, based upon the administrative record through April 1989. A.R. 30–31, 161– 162. He made his report in July 1989, three months before the Second Circuit issued its decision in *Kier*. At that time, the Secretary was relying on Social Security Ruling 83–19, which forbade adjudicators from considering a widow's residual functional capacity in determining medical equivalence. *Kier v. Sullivan*, 888 F.2d at 247. Thus, under the Secretary's view of the law at the time, it was not necessary for Dr. Kohn to consider Ms. Wachter's residual functional capacity in

reaching his determination. · There is no indication that he did so. A.R. 161, ¶ 2. He did comment that Ms. Wachter was "able to do sedentary or light physical activity, since she apparently does much around the house such as her laundry, bed changing and similar activity." A.R. 162. But he clearly did not take this into account in reaching his conclusion that Ms. Wachter's condition did not meet or equal any listed impairment. And indeed, had he done so there would have been good reason to discount his opinion, because his impression that Ms. Wachter was able to do "much around the house" was in direct conflict with Ms. Wachter's and Ms. Harvey's hearing testimony and Dr. Furr's April 28, 1989, report. Dr. Kohn's comment appears to have been based on Dr. Furr's February 1, 1989, description of Ms. Wachter's functional abilities in March, 1987.

In her May 6, 1991, decision, the ALJ relied heavily on Dr. Kohn's report to establish that Ms. Wachter's condition was not equivalent to any listed impairment, A.R. 31, and to reach her determination that Ms. Wachter could not be considered disabled under the Act prior to August 1, 1990. A.R. 31–34. She failed to note that Dr. Kohn had not considered Ms. Wachter's residual functional capacity in reaching his determination of lack of medical equivalence. Her reliance on his report was therefore misplaced.

The ALJ stated that she had considered the hearing testimony, and had applied *Kier*, in concluding that Ms. Wachter did not suffer from an impairment equal in severity to a listed impairment. A.R. 29. However, her reliance on Dr. Kohn's pre-*Kier* determination, coupled with her failure to actually discuss the testimony of Ms. Wachter and Ms. Harvey, indicates that she did not, in fact, properly consider residual functional capacity in reaching this determination. At the least, her failure to discuss the hearing testimony represents a failure to articulate reasons for accepting or rejecting an important line of relevant evidence. *See Herron v. Shalala*, 19 F.3d at 333. But further, it indicates that her determination was not, in fact, based upon consideration of all evidence of pertinent weight. *Cf. New York ex rel. Bodnar v. Secretary of Health and Human Services*, 903 F.2d at 126–127.

For purposes of determining whether Ms. Wachter was entitled to benefits payable as of January 1, 1991, the ALJ found that as of August 1, 1990, Ms. Wachter retained the residual functional capacity to perform the full range of sedentary work as described under 20 C.F.R. § 404.1567. A.R. 31–33. This finding, if correct, would provide support for a determination that on August 1, 1990, and prior to that time, Ms. Wachter was not disabled under the pre–1991 language of the Act and *Kier*. The finding was based on the reports of treating physicians Dr. Furr and Dr. Davis. A.R. 31–32. Again, however, the ALJ's analysis is devoid of any discussion of Ms. Wachter's and Ms. Harvey's hearing testimony, which strongly suggests that Ms. Wachter would have had great difficulty in performing *any* gainful activity.

### CONCLUSION

There is sufficient evidence in the record to support the conclusion that Ms. Wachter was capable of performing gainful activity from March 25, 1987, the date of her application for widow's benefits, until October 12, 1988, when she was examined by Dr. Edward Davis. However, the Secretary's determination that Ms. Wachter was not disabled under the meaning of the Act between October 12, 1988, and August 1, 1990, and that she was therefore not entitled to benefits until January 1, 1991, cannot be upheld. In determining that Ms. Wachter's condition was not equivalent to a listed impairment, the ALJ improperly relied upon Dr. Kohn's pre-*Kier* opinion, and she failed to discuss, and apparently failed to consider, Ms. Wachter's and Ms. Harvey's descriptions of Ms. Wachter's severe physical limitations. Ms. Wachter was entitled to consideration of those descriptions under *Kier* and 20 C.F.R. § 404.-1545(a). Accordingly, the court remands this case for full reevaluation of Ms. Wachter's capacity to engage in gainful activity in the period from October 12, 1988, to December 31, 1990, and for reconsideration of her eligibility for widow's benefits during that period.

So ordered.